Present:   All the Justices

MIMI DIDATO

v.  Record No. 003030

PAUL M. STREHLER, M.D., ET AL.

OPINION BY JUSTICE LEROY R. HASSELL, SR.
November 2, 2001

GARY DIDATO

v.  Record No. 003031

PAUL M. STREHLER, M.D., ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Melvin R. Hughes, Jr., Judge

In these consolidated appeals from judgments sustaining the defendants' demurrers in medical negligence actions, we consider whether the plaintiffs' motions for judgment alleged viable causes of action based upon negligence, the assumption of a duty, and the creation of a special relationship.

I.

Mimi Didato and her husband, Gary Didato, filed separate amended motions for judgment against Paul M. Strehler, M.D., and Chippenham Pediatric & Adolescent Medicine, P.C. (Chippenham Pediatric).  Mimi Didato and Gary Didato, to whom we will refer jointly as the plaintiffs, alleged in their separate motions for judgment that the defendants breached certain duties owed to them.  The defendants filed demurrers to the amended motions for judgment and asserted that the

plaintiffs failed to allege viable causes of action against them.

The circuit court sustained the demurrers. The circuit court concluded that: the plaintiffs failed to allege that they were patients of the defendants and, therefore, the defendants owed no duty to the plaintiffs; a special relationship did not exist between the plaintiffs and the defendants and, therefore, the defendants owed no duty to the plaintiffs under that theory of recovery; and the defendants did not assume a duty owed to the plaintiffs.

The circuit court entered judgments in favor of the defendants. We awarded the plaintiffs appeals from the judgments, and we consolidated their cases.

II.

A.

A demurrer "admits the truth of all material facts that are properly pleaded, facts which are impliedly alleged, and facts which may be fairly and justly inferred from alleged facts." Cox Cable Hampton Roads, Inc. v. City of Norfolk, 242 Va. 394, 397, 410 S.E.2d 652, 653 (1991). Thus, we will state the relevant facts, contained in the plaintiffs' amended motions for judgment, which are necessary for our resolution of these appeals.

Strehler is a physician licensed to practice medicine in this Commonwealth, and he is engaged in the practice of pediatrics. Chippenham Pediatric is a professional corporation registered to do business in this Commonwealth and provides pediatric services. Strehler is an officer and employee of Chippenham Pediatric. The Didatos are the parents of three children: Matthew, born on January 21, 1993; Gabrielle, born on September 28, 1994; and Nicholas, born on May 12, 1998.

In 1993, the plaintiffs "presented to Dr. Strehler and Chippenham Pediatric and requested that they provide their family including themselves and their infant son Matthew all health care [that] a family should receive from a pediatrician and a professional corporation engaged in providing health care services relating to the practice of pediatrics." Pursuant to this request, "Dr. Strehler and Chippenham Pediatric agreed to provide the Didato family all health care [that] members of a family should receive from a pediatrician and a professional corporation engaged in providing health care services relating to the practice of pediatrics." The relationship between the Didato family and the defendants "continued without interruption until 1997," when the plaintiffs moved from Virginia to Connecticut.

According to the plaintiffs, thalassemia and sickle cell disease are inherited diseases of the blood known as hemoglobinopathies. "Thalassemia is a form of anemia (red blood cell deficiency). Hemoglobin is the oxygen-carrying component of the red blood cells. It is made of two different kinds of proteins, called alpha and beta globins. If the body doesn't produce both of these two proteins, the red blood cells do not form properly and do not carry sufficient oxygen. The result is anemia that begins in early childhood and persists throughout life. There are a number of varieties of thalassemia. If the body does not produce beta globins, the resultant disease is called beta thalassemia."

The plaintiffs stated in the amended motions for judgment that "[s]ickle cell disease (also referred to as 'sickle cell anemia') is caused by the presence of an abnormal type of hemoglobin called 'sickle hemoglobin' in red blood cells. The presence of sickle hemoglobin causes red blood cells to change from their usual biconcave disc shape to a crescent or sickle shape. The abnormal hemoglobin makes the red blood cells unable to carry oxygen and the abnormal shape can also cause the red blood cells to clog small blood vessels forming clots and preventing some organs and tissue from receiving sufficient oxygen. When this occurs, red blood cells are damaged and destroyed producing anemia and the victim of

4

sickle cell disease will experience episodes of severe pain and sustain damage to organs and tissue."

Continuing, the plaintiffs stated that "[s]ome of the various clinical manifestations of sickle cell disease include painful swelling of the hands and feet caused by ischemic necrosis of the small bones, illnesses accompanied by fever, hypoxia and acidosis, infarction of bone marrow, splenic infarcts, splenic enlargement leading to circulatory collapse, pulmonary infarction, strokes, ischemic damage to heart, liver, kidneys and eyes and priapism (painful penile erections)."

According to the plaintiffs, "[v]ictims of sickle cell disease are susceptible to meningitis, sepsis and other serious infections and a high risk for a lethal, rapid decrease in hemoglobin level (aplastic episode). . . .  By mid-childhood most victims of sickle cell disease are underweight and have an enlarged heart.  Puberty is frequently delayed.  Throughout life, the victim of sickle cell disease will suffer a barrage of medical crises and can expect to experience pain in varying levels of intensity on a daily basis. . . .  The life expectancy of sickle cell disease victims is dramatically reduced as a consequence of the disease and its sequelae."

The plaintiffs also pled that "[b]oth thalassemia and sickle cell disease are autosomal recessive disorders.  This means these disorders only occur when both parents carry the gene for the disorder.  If both parents are carriers of the abnormal gene responsible for producing the disorder, there is a 25 per cent possibility that a child of the parents will have the disorder.  A person who carries the gene for thalassemia has the 'thalassemia trait.'  A person who carries the gene for sickle cell disease has the 'sickle cell trait.' . . . If one parent is a carrier of the beta thalassemia trait and the other parent is a carrier of sickle cell trait, there is a 25 per cent possibility that a child of the parents will be born with a type of sickle cell disease known as sickle beta thalassemia."  Continuing, the plaintiffs stated that "[o]ne form of sickle beta thalassemia disease is called sickle beta O thalassemia.  This is the most severe form of sickle beta thalassemia."

"The beta thalassemia trait is found primarily in persons of Mediterranean, African or Southeast Asian origin. . . . [Mr.] Didato is of Sicilian descent and is therefore a person of Mediterranean origin. . . .  The sickle cell trait is found primarily in persons of African, Caribbean, Latin American, Southeast Asian, Middle Eastern or Mediterranean origin. . . . Mrs. Didato's mother is Dominican and her father is of Spanish

6

and Portuguese descent and Mrs. Didato is therefore a person of Caribbean, Latin American and Mediterranean origin."

The plaintiffs stated in their amended motions that "[b]y the 1970's, technology to screen infants for sickle cell trait and disease and thalassemia trait and disease was available. . . .  By 1979, a number of pediatricians were advocating screening of newborns for sickle cell trait and disease and thalassemia trait and disease to help accomplish two objectives:  provision of optimum medical care of patients with the disease and the prevention of the disease through genetic counseling."

According to the plaintiffs, "[p]urposes of genetic counseling include making persons such as the parents of [a] newborn who tested positive for sickle cell or thalassemia trait aware of the risk of parenting a child with thalassemia or sickle cell disease, the availability of further genetic testing for the parents and the various alternatives for disease prevention.  The information made available to parents through genetic counseling and follow-up activities recommended by genetic counseling would include the 25 per cent risk of future offspring with sickle cell disease if both parents were carriers of sickle cell trait or one parent was a carrier of sickle cell trait and the other a carrier of thalassemia trait.  In such parents, the options made known to

7

the parents through genetic counseling and its follow-up activities would include preventing the birth of a child with sickle cell disease by termination of any unplanned pregnancy when prenatal diagnosis revealed the fetus was positive for sickle cell disease or thalassemia or avoiding all pregnancies by birth control."

The plaintiffs alleged that in 1987, representatives of certain medical specialties, including pediatricians, reached a consensus that "[g]ood medical practice dictated that screening for sickle cell disease and thalassemia should be provided to all newborns as a result of ordinary care and that state law should require provision of such services[; i]f the screening demonstrated that the newborn did not suffer from the disease and therefore required no specialized medical care but was a carrier, information about the newborn's carrier state should be furnished to the parents of the newborn[; t]he information provided to the parents should explain that although the newborn's carrier state is not a disease, there may be implications for other family members, and, depending on results of family studies, future children may be at risk for a clinically significant hemoglobinopathy[; and a] referral source for family testing and genetic counseling should be clearly identified for the parents."

The plaintiffs further stated that "[p]rior to 1994, Virginia and most other states had initiated a newborn screening program for hemoglobinopathies."  Continuing, the plaintiffs alleged that in 1994, Code § 32.1-65 "provided that each infant born in the Commonwealth would be subject to a screening test for sickle cell diseases unless the infant's parent or guardian objected on religious grounds."  The plaintiffs also alleged that before September 28, 1994, "pediatricians in Virginia and elsewhere in the United States had determined that [a] pediatrician who [was] caring for a newborn and [was] aware that the newborn carries the sickle cell trait [was] in the best position to alert the parents" of a newborn of their child's status as a carrier and to communicate certain information to the parents.

Strehler and Chippenham Pediatric became aware that Mr. Didato and his son Matthew carried the thalassemia trait before the birth of Gabrielle on September 28, 1994.  "At the time of the birth of Gabrielle on September 28, 1994, Dr. Strehler and Chippenham Pediatric agreed to become the pediatrician and pediatric practice entity responsible for providing Gabrielle and her family including [Mr.] and Mrs. Didato all health care [that] Gabrielle and her family should receive from a pediatrician and a professional corporation

engaged in providing health care services relating to the practice of pediatrics."

The plaintiffs alleged that "[a]t the time of the birth of Gabrielle on September 28, 1994, Dr. Strehler and Chippenham Pediatric knew that blood would be drawn for Gabrielle and screened for the presence of hemoglobinopathies." These defendants "knew that the results of the newborn screening of Gabrielle for the presence of hemoglobinopathies would be reported to [them]." The defendants also knew that the plaintiffs expected the defendants to communicate to the plaintiffs any information and facts of clinical significance concerning the results of the newborn screening of Gabrielle.

In October 1994, the defendants were notified in writing that a newborn screening test of Gabrielle indicated "HEMOGLOBIN PATTERN = PROBABLE FAS." The defendants also knew that "FAS" meant fetal adult sickle hemoglobin. When the defendants were notified of these results, Strehler knew that the newborn screening of Gabrielle's blood indicated that she was a carrier of the sickle cell trait. Strehler and Chippenham Pediatric were notified and knew that Mr. Didato was a carrier of the thalassemia trait. The defendants also knew "that it was very possible that [the plaintiffs] would conceive together other children in the future." The

defendants "knew that any child born to [the plaintiffs] in the future had a 25 per cent risk of suffering from sickle cell beta thalassemia."

After Gabrielle's birth, Mrs. Didato, "acting on her behalf and on behalf of Gabrielle and [Mr.] Didato, asked an employee of Chippenham Pediatric about the results of the newborn screening of Gabrielle and was informed by an employee acting in the scope of the employee's employment by Chippenham Pediatric and authorized to speak on behalf of Chippenham Pediatric that since Mrs. Didato had not been informed about any abnormality by Dr. Strehler or Chippenham Pediatric, it meant the newborn screening was normal."

The plaintiffs reasonably relied upon the representation of Chippenham Pediatric that Gabrielle's newborn screening results were normal. The plaintiffs alleged that the defendants knew that the plaintiffs would rely upon these representations.

On May 12, 1998, Mrs. Didato gave birth to Nicholas, who was subsequently diagnosed as suffering from sickle cell beta O thalassemia. The plaintiffs learned for the first time, after Nicholas' birth, that Gabrielle was a carrier of the sickle cell trait. Had the defendants informed the plaintiffs that Gabrielle was a carrier of the sickle cell trait, the plaintiffs would not have conceived any additional children

11

thereby avoiding the risk of having a child born with sickle cell beta thalassemia.

III.

A.

Plaintiffs argue that they pled sufficient facts to support a cause of action for negligence against the defendants and that contrary to the circuit court's ruling, a physician-patient relationship existed between the plaintiffs and the defendants. The defendants respond that the plaintiffs were not patients of Strehler or Chippenham Pediatric within the meaning of Code § 8.01-581.1 and, therefore, they did not owe any duties to the plaintiffs. Hence, the defendants contend that the plaintiffs failed to plead a cause of action against them. We disagree with the defendants.

Code § 8.01-581.1, which is a part of the Virginia Medical Malpractice Act, states in relevant part:

> " 'Health care' means any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical diagnosis, care, treatment or confinement.
> " 'Health care provider' means (i) a person, corporation, facility or institution licensed by this Commonwealth to provide health care or professional services as a physician or hospital . . . [or] (ii) a professional corporation . . . .
>
> . . . .

12

" '_Malpractice_' means any tort based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient.

" '_Patient_' means any natural person who receives or should have received health care from a licensed health care provider except those persons who are given health care in an emergency situation which exempts the health care provider from liability for his emergency services in accordance with § 8.01-225."

There is no dispute that the defendants are health care providers within the meaning of the Medical Malpractice Act. The only dispute is whether the plaintiffs are patients within the meaning of the Act.

The plaintiffs pled in their amended motions for judgment that they requested the defendants to provide all health care that a family should receive from a pediatrician and a professional corporation engaged in providing health care services relating to the practice of pediatrics. The plaintiffs alleged that the defendants agreed to provide the Didato family with the requested services. Code § 8.01-581.1 defines a patient as "any natural person who receives or should have received health care from a licensed health care provider." Applying the definitions in Code § 8.01-581.1, we hold that the plaintiffs pled sufficient facts which, if proven at a trial, would establish the existence of a

13

physician-patient relationship between the plaintiffs and the defendants.

Additionally, we observe that "[a] physician's duty arises only upon the creation of a physician-patient relationship; that relationship springs from a consensual transaction, a contract, express or implied, general or special . . . and a patient is entitled to damages resulting from a breach of a physician's duty." Lyons v. Grether, 218 Va. 630, 633, 239 S.E.2d 103, 105 (1977) (citations omitted); accord Prosise v. Foster, 261 Va. 417, 421, 544 S.E.2d 331, 332 (2001). The facts pled in the plaintiffs' motions, if proven at trial, would permit a jury to find that a physician-patient relationship existed between the plaintiffs and the defendants.

The defendants, relying upon Gray v. INOVA Health Care Services, 257 Va. 597, 514 S.E.2d 355 (1999), contend that as a matter of law, they owed no duties to the plaintiffs. We disagree. Our decision in Gray is simply not pertinent here.

In Gray, we considered "whether a parent who witnesses the effects of a negligent tort committed upon a child in the presence of the parent has a cause of action in tort against the tortfeasor for negligent infliction of emotional distress and its symptomatic effects." Id. at 598, 514 S.E.2d at 355-56. Holly Gray alleged in her motion for judgment that her

14

three-year-old daughter was admitted to a hospital owned and operated by INOVA Health Care Services. According to her motion, health care providers negligently administered the drug Fentanyl to Mrs. Gray's daughter during a procedure to test her for meningitis. The daughter experienced a convulsion, stopped breathing, and her face turned blue. Mrs. Gray, who was "standing next to her daughter . . . observed the condition of her daughter [and Gray] experienced extreme fright and shock, temporarily blacked out, fell to the floor, and became physically sick and vomited." Id., 514 S.E.2d at 356.

We reviewed the allegations contained in Gray's motion for judgment, and we held that INOVA owed no duty to Mrs. Gray because she was not the patient upon whom medical tests were performed. Id. at 599, 514 S.E.2d at 356. Unlike the pleadings in Gray, the plaintiffs' motions for judgment filed in the present cases contain allegations that defendants Strehler and Chippenham Pediatric "agreed to provide the Didato family all health care [that] members of a family should receive from a pediatrician and a professional corporation engaged in providing health care services relating to the practice of pediatrics."

Moreover, we have stated that a "plaintiff who seeks to establish actionable negligence must plead the existence of a

15

legal duty, violation of that duty, and proximate causation which results in injury."  Delk v. Columbia/HCA Healthcare Corp., 259 Va. 125, 132, 523 S.E.2d 826, 830 (2000).  The plaintiffs pled that in 1987, a consensus was reached among representatives of the concerned medical specialties, including pediatricians, that "[g]ood medical practice dictated that screening for sickle cell disease and thalassemia should be provided to all newborns," that the results of such tests should be communicated to the parents of the child and that "[a] referral source for family testing and genetic counseling should be clearly identified for the parents."  Assuming that the plaintiffs can establish at a trial that the standard of care in this Commonwealth required that a reasonably prudent pediatrician discharge these duties, that the defendants failed to do so, and that their failure was a proximate cause of the plaintiffs' injuries, then the plaintiffs would establish prima facie cases of negligence.

B.

The plaintiffs contend that their amended motions for judgment contain cognizable causes of action against the defendants because the plaintiffs pled that "the defendants assumed a duty to exercise reasonable care in the communication of information [to them,] even if no duty had existed prior to this undertaking."  Thus, the plaintiffs

16

contend that the circuit court erred in sustaining the defendants' demurrers. Responding, the defendants state that they cannot assume a duty to a non-patient to comply with the standard of care set forth in [Code] § 8.01-581.20, which states in relevant part:

"A. In any proceeding before a medical malpractice review panel or in any action against a physician . . . or other health care provider to recover damages alleged to have been caused by medical malpractice where the acts or omissions so complained of are alleged to have occurred in this Commonwealth, the standard of care by which the acts or omissions are to be judged shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth and the testimony of an expert witness, otherwise qualified, as to such standard of care, shall be admitted; provided, however, that the standard of care in the locality or in similar localities in which the alleged act or omission occurred shall be applied if any party shall prove by a preponderance of the evidence that the health care services and health care facilities available in the locality and the customary practices in such locality or similar localities give rise to a standard of care which is more appropriate than a statewide standard. . . .
"B. In any action for damages resulting from medical malpractice, any issue as to the standard of care to be applied shall be determined by the jury, or the court trying the case without a jury."

We disagree with the defendants' contentions.

As the plaintiffs correctly point out, and the defendants do not dispute, we have cited with approval the legal principle that "[i]t is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject

17

to the duty of acting carefully, if he acts at all." Nolde Bros. v. Wray, 221 Va. 25, 28, 266 S.E.2d 882, 884 (1980) (quoting Glanzer v. Shepard, 135 N.E. 275, 276 (N.Y. 1922)); accord Ring v. Poelman, 240 Va. 323, 326, 397 S.E.2d 824, 826 (1990); Cofield v. Nuckles, 239 Va. 186, 192, 387 S.E.2d 493, 496 (1990). We also observe that this common law principle is embodied in the Restatement (Second) of Torts § 323:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>      "(a) his failure to exercise such care increases the risk of such harm, or
>      "(b) the harm is suffered because of the other's reliance upon the undertaking."

Even if the plaintiffs are unable to establish with evidence at trial that the standard of care required that a reasonably prudent pediatrician communicate certain information to them, the plaintiffs pled sufficient facts which, if proven at trial, would permit the finder of fact to conclude that the defendants assumed the duty to convey to the plaintiffs the correct results of their daughter's test, which indicated that she carried the sickle cell trait.

The defendants' contention that they could not assume a duty to a non-patient to comply with the standard of care in Code § 8.01-581.20 is without merit. We find no language in

18

Code § 8.01-581.20 which vitiates the common law rule that one who assumes a duty must discharge that duty with reasonable care.

## C.

The plaintiffs contend that "[u]nder certain circumstances . . . a physician will owe a duty to a person who is not a patient if there is a special relationship between the person and the physician."  Continuing, the plaintiffs contend that a special relationship existed between them and the defendants which imposed certain duties upon the defendants, including the duty to warn the plaintiffs that there was "a mathematically certain risk of 25% that any future child of the Didatos would suffer from sickle cell beta O thalassemia."  The plaintiffs rely upon the following decisions to support their contentions:  Thompson v. Skate America, Inc., 261 Va. 121, 540 S.E.2d 123 (2001); Delk, 259 Va. 125, 523 S.E.2d 826; A.H. v. Rockingham Publishing Co., 255 Va. 216, 495 S.E.2d 482 (1998); and Burdette v. Marks, 244 Va. 309, 421 S.E.2d 419 (1992).  We disagree with the plaintiffs' contentions.

We have held that generally a person does not have a duty to protect another from the conduct of third persons. Delk, 259 Va. at 132, 523 S.E.2d at 830; Burdette, 244 Va. at 311, 421 S.E.2d at 420; Marshall v. Winston, 239 Va. 315, 318, 389

19

S.E.2d 902, 904 (1990). However, we stated that this general rule does not apply when a special relationship exists between a defendant and a plaintiff which gives rise to a right to protection to the plaintiff or between the defendant and third persons which imposes a duty upon the defendant to control the third person's conduct. Thompson, 261 Va. at 129, 540 S.E.2d at 127; Delk, 259 Va. at 132, 523 S.E.2d at 830-31; A.H., 255 Va. at 220, 495 S.E.2d at 485; Burdette, 244 Va. at 312, 421 S.E.2d at 420; Dudley v. Offender Aid & Restoration, 241 Va. 270, 276, 401 S.E.2d 878, 881 (1991); Fox v. Custis, 236 Va. 69, 74, 372 S.E.2d 373, 375 (1988); Klingbeil Management Group Co. v. Vito, 233 Va. 445, 447-48, 357 S.E.2d 200, 201 (1987). We hold that the plaintiffs failed to plead cognizable causes of action within the ambit of our jurisprudence governing special relationships as discussed in Thompson v. Skate America, Delk v. Columbia/HCA Healthcare Corp., A.H. v. Rockingham Publishing Co., Burdette v. Marks, and Nasser v. Parker, 249 Va. 172, 455 S.E.2d 502 (1995), because those relationships give rise to a duty of protection from criminal acts committed by third parties. The legal principles articulated and applied in these cases have no application here.

IV.

20

Accordingly, we will affirm that portion of the circuit court's judgments that sustained the defendants' demurrers on the basis that the plaintiffs failed to plead causes of action that gave rise to a special relationship between the plaintiffs and the defendants.  We will reverse the remaining portions of the circuit court's judgments, and we will remand these cases for further proceedings on the plaintiffs' claims of negligence and assumption of duties.

Record No. 003030 – Affirmed in part, reversed in part, and remanded.

Record No. 003031 – Affirmed in part, reversed in part, and remanded.