## CIRCUIT COURT OF THE CITY OF SUFFOLK

Lawrence J. Monahan, Jr.

v.

Obici Medical Management
Services, Inc.,
David J. Weinstein,
and Carrie Wiggins

August 2, 2002

Case No. (Law) CL01-573

BY JUDGE D. ARTHUR KELSEY

Lawrence J. Monahan, Jr., claims he received substandard medical treatment from a nurse practitioner, Carrie Wiggins, employed by Obici Medical Management Services, Inc. Monahan also sued Dr. David J. Weinstein claiming that he too can be held liable because (i) a physician-patient relationship between them can be implied in law as a result of statutes and regulations imposing a duty on Dr. Weinstein to supervise Nurse Wiggins, and (ii) in any event, a consensual physician-patient relationship existed between Monahan and Dr. Weinstein under the unique facts of this case.

Finding fault with each of these assertions, Dr. Weinstein moves the Court to dismiss all claims against him and to enter summary judgment in his favor. For the following reasons, the Court grants in part and denies in part the motion.

I. Monahan alleges that he experienced dizziness and blurred vision on August 28, 2001. See Amended Motion for Judgment, ¶ 12. He went to Wakefield Medical Center seeking the services of a physician, but instead was examined by a nurse practitioner, Carrie Wiggins. *Id.*, ¶ 13. Nurse Wiggins found that Monahan had a "highly elevated" blood pressure and advised him to take some prescription blood pressure medicine and to return home for bed rest. *Id.*, ¶ 13. Monahan alleges he took the medicine, went home to rest, and after "the passage of some time" he "apparently suffered a stroke or other sudden medical emergency." *Id.*

Monahan contends that his condition required "immediate hospitalization" and should not have been dismissed as a minor one requiring only an instruction "to have a prescription filled for medication and to go to bed." *Id.* Monahan admits, however, that he had "no contact" with Dr. Weinstein on August 28, 2001, "by telephone, personal meeting, or otherwise." Request for Admission, ¶ 1. Monahan also concedes that "Dr. David Weinstein was not present on the premises of the Wakefield Medical Center" while Monahan was being examined by Nurse Wiggins. Request for Admission, ¶ 3.

Monahan contends that Nurse Wiggins and Dr. Weinstein work for Obici Medical Management Services, Inc., their joint employer. See Amended Motion for Judgment, ¶¶ 2-5. Monahan seeks to impose respondeat superior liability on Obici Medical Management Services, Inc., for the alleged negligence of Nurse Wiggins and Dr. Weinstein.

The Court earlier sustained a demurrer filed by Dr. Weinstein on the ground that Monahan failed to allege a physician-patient relationship existed between them. See Order (April 9, 2002) (Parker, C.J.). Monahan filed an Amended Motion for Judgment which prompted another demurrer by Dr. Weinstein. Dr. Weinstein later filed the present summary judgment motion, which subsumes the arguments in the two earlier demurrers.

In the summary judgment motion, Dr. Weinstein requests a dismissal with prejudice of all claims against him. He cannot be liable, Dr. Weinstein argues, because he had no physician-patient relationship with Monahan — either one implied in law or one arising out of a consensual undertaking on his part.

At oral argument, Monahan contended that an implied in law physician-patient relationship between him and Dr. Weinstein should be recognized because Va. Code Ann. § 54.1-2901(3) (Michie Supp. 2001) authorizes nurse practitioners to render care "under the supervision of a duly licensed

physician," and Dr. Weinstein served as the supervising physician for Nurse Wiggins. See Amended Motion for Judgment, ¶¶ 7, 8, 15. Under Virginia Board of Medicine regulations, the term "supervision" means that the physician must maintain "ultimate responsibility for the agreed-upon course of treatment and medications prescribed." 18 Va. Admin. Code § 90-40-10 (West 2002).

In addition, the same regulations require a supervising physician to regularly practice in the location "in which the licensed nurse practitioner exercises prescriptive authority." 18 Va. Admin. Code § 90-40-100 (West 2002). "A separate practice setting may not be established for the nurse practitioner." *Id.* For these reasons, Monahan contends, "the law of Virginia imposes a duty on Dr. Weinstein in this case, even though Dr. Weinstein never saw, treated, and/or examined the plaintiff" because Dr. Weinstein maintained "ultimate responsibility" for any negligence of the nurse practitioner under his supervision. Plaintiff's Brief at 5 (April 18, 2002).

After oral argument, Monahan advised the Court that — even if no implied in law relationship existed — he had developed additional evidence that "will clearly show that Dr. Weinstein had a consensual physician/patient relationship with Lawrence Monahan concerning his August 28, 2001, medical treatment." Russell Letter to Court (July 9, 2002) (emphasis added). Monahan later filed a deposition transcript of Dr. Weinstein purporting to demonstrate that a consensual physician-patient relationship existed between them. Proof of such a relationship, Monahan asserts, renders "superfluous" the summary judgment motion. *Id.*; see also Plaintiff's Brief in Opposition (July 25, 2002).

II. Virginia Supreme Court Rule 3:18 authorizes summary judgment when the "moving party is entitled to judgment" and no "material fact is genuinely in dispute." Genuine factual disputes "should be submitted to the finder of fact and not resolved on summary judgment." *Brown v. Sparks*, 262 Va. 567, 571, 554 S.E.2d 449, 451 (2001). In determining which facts are material, a trial court should view the evidence through the prism of the controlling legal standard. From that vantage point, a trial court "must adopt those inferences from the facts that are most favorable to the nonmoving party." *Buonocore v. C. & P. Tel. Co.*, 254 Va. 469, 472, 492 S.E.2d 439, 440 (1997) (citation omitted).

That said, no court must accept inferences that are "forced, strained, or contrary to reason." *Dudas v. Glenwood Golf Club*, 261 Va. 133, 136, 540 S.E.2d 129, 131 (2001); *Carson v. LeBlanc*, 245 Va. 135, 139-40, 427 S.E.2d

189, 192 (1993). Equally true for summary judgment motions as with demurrers, a court should not presume the "correctness of the pleader's conclusions of law." *Yuzefovsky v. St. John's Wood Apts.*, 261 Va. 97, 102, 540 S.E.2d 134, 137 (2001).

In short, a trial court should "bring litigation to an end at an early stage" when it clearly appears that one of the parties is "entitled to a judgment in the case" based upon a review of the pleadings and judicial admissions. Carson, 245 Va. at 140, 427 S.E.2d at 192 (quoting *Kasco Mills, Inc. v. Ferebee*, 197 Va. 589, 593, 90 S.E.2d 866, 870 (1956)). In this respect, when its conditions have been met, Rule 3:18 ("the court shall enter judgment") imposes on the trial court a mandatory duty to end litigation that has no factual or legal merit.

Though summary judgment has sometimes been derided as a "drastic remedy," *Shevel's, Inc. v. Southeastern Assoc.*, 228 Va. 175, 181, 320 S.E.2d 339, 342 (1984) (Russell, J.), such rhetorical descriptions have useful meaning only when the remedy is improperly awarded. When properly awarded, summary judgment is not drastic at all, but rather a matter of right to the moving party.

In other words, it is not "drastic" — i.e. "[t]aking effect violently or rapidly" or "[q]uite severe or radical in nature; extreme," *American Heritage Dictionary* 423 (2d ed. 1985) — to dismiss a legally meritless claim prior to trial. That is exactly what a prudent court should do. Rule 3:18 is a procedural right very much in the public's interest, for the remedy spares the party entitled to it the economic and transactional costs associated with defending to the end an obviously flawed lawsuit. In this respect, "Rule 3:18, which provides for summary judgment, achieves a salutary purpose when used appropriately." *Turner v. Lotts*, 244 Va. 554, 557, 422 S.E.2d 765, 766 (1992).

A. Under Virginia common law, a legal duty of care "arises only upon the creation of a physician-patient relationship" and that "springs from a consensual transaction, a contract, express or implied, general or special. . . ." *Didato v. Strehler*, 262 Va. 617, 626, 554 S.E.2d 42, 47 (2001) (quoting *Lyons v. Grether*, 218 Va. 630, 633, 239 S.E.2d 103, 105 (1977)). Virginia has long "recognized that the physician-patient relationship is a consensual one." *Washburn v. Klara*, 263 Va. 586, 590, 561 S.E.2d 682, 685 (2002) (citation omitted). The consensual relationship "exists if a patient entrusts his or her treatment to the physician and the physician accepts the case." *Prosise v. Foster*, 261 Va. 417, 421, 544 S.E.2d 331, 332 (2001).

Monahan argues that an implied in law relationship can be recognized from the statutory role that Dr. Weinstein has under Chapter 29 of Title 54.1 of the Virginia Code, governing the regulation of "Medicine and Other Healing Arts." Va. Code Ann. § 54.1-2957.01(A), for example, states that nurse practitioners have "prescriptive authority" (the legal authority to order prescription medications for a patient) only when they have entered into a "written agreement with a licensed physician which provides for the direction and supervision by such physician of the prescriptive practices of the nurse practitioner." Va. Code Ann. § 54.1-2901(3) makes clear that nurse practitioners may render care "under the supervision" of a duly licensed physician.

Administrative regulations confirm that a nurse practitioner may "engage in practices constituting the practice of medicine in collaboration with and under the medical direction and supervision of a licensed physician." 18 Va. Admin. Code § 90-30-120(A) (West 2002).[1] And, as used in the chapter dealing with the prescriptive authority of nurse practitioners, the term "supervision" means that the nurse practitioner has access to the "physician documents" for consultation — with the physician nonetheless "maintaining ultimate responsibility for the agreed-upon course of treatment and medications prescribed." 18 Va. Admin. Code § 90-40-10 (definition limited to chapter 40). Both the statute and administrative regulations, with certain exceptions, require supervising physicians to regularly practice "in any location in which the licensed nurse practitioner exercises prescriptive authority." 18 Va. Admin. Code § 90-40-100(A)(2). "A separate practice setting may not be established for the nurse practitioner." *Id.*

These statutory and regulatory provisions carry with them administrative sanctions. Violations "may result in the revocation or suspension of prescriptive authority and may also result in additional sanctions imposed on the license of the nurse practitioner by the joint boards or upon the license of the registered nurse by the Board of Nursing." 18 Va. Admin. Code § 90-40-140(D) (West 2002). But neither the enabling statutes nor the regulations themselves *create* a consensual relationship, even an implied one, between Monahan and Dr. Weinstein. To the contrary, they deal exclusively with the relationship of the nurse practitioner and the supervising physician, not the relationship between the patient and the physician.

---

[1] Va. Code Ann. § 54.1-2957 authorizes the Board of Medicine and the Board of Nursing to "jointly prescribe the regulations governing the licensure of nurse practitioners." *See also* Va. Code Ann. § 54.1-2957.01(C) (enabling statute for regulations governing prescriptive authority).

In this respect, the nurse practitioner statute is not unlike Va. Code Ann. § 54.1-2961 which deals with the professional relationship between medical apprentices (interns and residents) and their supervising doctors at hospitals. Standing alone, § 54.1-2961 does not create an implied in law relationship between patients and supervising physicians, *Prosise v. Foster*, 261 Va. 417, 421-24, 544 S.E.2d 331, 332-34 (2001), and thus patients of medical apprentices cannot sue supervising physicians merely because of their supervisory role. For a physician to have malpractice liability, she must "by virtue of her actions or her status" have specifically "agreed to accept responsibility for the care" of her apprentice's patients. *Prosise*, 261 Va. at 423, 544 S.E.2d at 334.

This conclusion finds additional support in the interplay between the common law and legislation. The common law requires a consensual relationship between the physician and patient as a precondition to the imposition of malpractice liability. Though he does not admit to it, Monahan's argument is little more than an assertion that the statutory scheme eliminates that requirement (he would say satisfies it) in favor of a new tort regime focusing instead on *supervisory liability*. In other words, if Monahan's argument prevailed, the actual existence of a consensual physician-patient relationship would not at all matter — the only thing that would is whether the physician had a statutory duty to supervise the nurse practitioner.

This new species of medical malpractice claim, based entirely on supervisory liability, is wholly unknown in the common law. To accept this theory of liability would offend the maxim that statutes should be "strictly construed" against displacing long-established common law principles. *See Patten v. Commonwealth*, 262 Va. 654, 658, 553 S.E.2d 517, 519 (2001); *Melanson v. Commonwealth*, 261 Va. 178, 181, 539 S.E.2d 433, 434 (2001). "Abrogation of the common law requires that the General Assembly plainly manifest an intent to do so." *Linhart v. Lawson*, 261 Va. 30, 35, 540 S.E.2d 875, 877 (2001). Neither the statutes governing nurse practitioners nor the corresponding regulations displace — in favor of a regime of supervisory tort liability — the common law requirement of a consensual physician-patient relationship.

B. Even without the aid of an implied in law physician-patient relationship (imposing some form of supervisory liability), Monahan contends that he has alleged a consensual relationship and has a good-faith factual basis to test that assertion at trial. Monahan proffers that a discovery

deposition of Dr. Weinstein establishes that he had a "consensual physician/patient relationship with Lawrence Monahan concerning this August 28, 2001, medical treatment." Russell Letter to Court (July 9, 2002); *see also* Plaintiff's Brief in Opposition (July 25, 2002). Dr. Weinstein disputes this assertion, claiming that nothing in his deposition made out a *prima facie* basis for establishing a consensual physician-patient relationship. *See* Dillman Letter to Court (July 22, 2002).

Because of the limitations of Rule 3:18, the Court cannot resolve this dispute. Summary judgment can be entered based only on the plaintiff's pleadings and judicial admissions. *See* Va. Sup. Ct. Rule 3:18 (Summary judgment cannot be "based in whole or in part upon any discovery depositions" absent consent.); *see also* Va. Code Ann. § 8.01-420 (Michie 2000); Va. Sup. Ct. Rule 4:7(e). If discovery depositions play any role in the summary judgment analysis, it is as a weapon against the entry of summary judgment. *See generally* W. Hamilton Bryson, *Virginia Civil Procedure* 384 (3d ed. 1997) ("On the other hand, there is no state statute or rule of court that prohibits the use of depositions to oppose a motion for summary judgment.").

A review of the pleadings and judicial admissions does not eliminate a genuine issue of fact on the existence of a consensual relationship. Monahan admitted that he had no personal contact with Dr. Weinstein on August 28, 2001, and that Dr. Weinstein was not at the Wakefield Medical Center that day. *See* Request for Admissions, ¶¶ 1 & 3. Those facts, standing alone, do not preclude the possibility that Dr. Weinstein "by virtue of [his] actions or [his] status" in fact specifically "agreed to accept responsibility for the care" of Monahan. *Prosise*, 261 Va. at 423, 544 S.E.2d at 334. Any number of examples (a pathologist, radiologist, or consulting physician) demonstrates that a consensual physician-patient relationship can exist despite the absence of any face-to-face contact between the doctor and his patient.

In this case, Monahan specifically alleges that Dr. Weinstein "directed" Nurse Wiggins at "all times and places pertinent to this action," Amended Motion for Judgment, ¶ 8, which would include the time period in which Nurse Wiggins examined and treated Monahan. In addition, Monahan contends that Dr. Weinstein had been Monahan's family physician for more than thirty years and had been monitoring the situation directly with Nurse Wiggins shortly after the August 28 office visit. *See* Plaintiff's Brief in Opposition, 2-3 (July 25, 2002).

Given the procedural posture of this case, all that can be said now is that Monahan cannot establish an implied in law physician-patient relationship simply by virtue of the statutory and regulatory provisions governing nurse

practitioners. Whether he can demonstrate a consensual relationship cannot be resolved with finality by examining Monahan's pleadings and judicial admissions. For this reason, the Court denies the summary judgment motion to the extent it seeks a dismissal of Monahan's claim that a consensual physician-patient relationship existed and that Dr. Weinstein violated his duty of care arising out of that relationship.

III. As a matter of law, Monahan cannot assert a medical malpractice claim against Dr. Weinstein solely on the theory that the nurse practitioner statutes and regulations create an implied in law physician-patient relationship between them. On this claim, the Court grants in part Dr. Weinstein's motion for summary judgment. With respect to Monahan's claim that a consensual relationship existed and that Dr. Monahan breached the duty of care arising out of that relationship, the Court denies in part the summary judgment motion. It is so ordered.