PRESENT: All the Justices

REBECCA ANN STOOTS, ADMINISTRATOR OF
THE ESTATE OF CALVIN HARMON STOOTS

v. Record No. 201202

MARION LIFE SAVING CREW, INC., ET AL.

OPINION BY
JUSTICE CLEO E. POWELL
DECEMBER 22, 2021

FROM THE CIRCUIT COURT OF SMYTH COUNTY
William Alexander, II, Judge Designate

Rebecca Ann Stoots ("Stoots") appeals the decision of Circuit Court of Smyth County ruling that Marion Life Saving Crew, Inc. ("MLSC") and its paramedics were entitled to statutory immunity pursuant to Code § 8.01-255(A)(5).

## I. BACKGROUND

MLSC is a nonprofit entity qualified under § 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), whose primary purpose is to provide organized lifesaving and first aid services for Smyth County, Virginia. On February 12, 2013, the Smyth County Board of Supervisors adopted resolutions recognizing MLSC as an integral part of the official safety system of the county and as a designated emergency response agency. MLSC provided this service through its single salaried employee and volunteer crew members. Although MLSC engages in billing for its services to insurance and individuals, it does not engage in any collection activities for those unable to pay.

Additionally, MLSC had a "Membership Incentive Program"[1] ("MIP") whereby volunteers were eligible to receive payment, commensurate with the volunteer's level of

---

[1] "Membership Incentive Program" is how MLSC refers to the program in its General Ledger.

experience, for each shift beyond the first three worked each month. The volunteers who chose to participate in the program filled out a timesheet at the end of each month and designated which shifts were paid and which shifts were volunteer. The payments were considered taxable income and MLSC issued IRS Form 1099s to the crew members reflecting the payments they received.

On February 9, 2014, forty-three-year-old Calvin Harmon Stoots ("Calvin") began having difficulty breathing at his home in Smyth County. He subsequently became unresponsive and, shortly thereafter his sister, Stoots, arrived. Noting Calvin's difficulty breathing, Stoots believed he was suffering from ketoacidosis associated with his diabetes and called 911 to seek emergency assistance. Two paramedics from MLSC, James Thompson ("Thompson") and Zachary Powell ("Powell"), responded. Upon arrival, they determined that Calvin was still breathing with a normal resting heart rate.

Stoots asked Powell and Thompson to take Calvin to the hospital and render care. She provided them with a Virginia Advance Directive for Health Care (the "Advance Directive"), which named Stoots as Calvin's medical agent and gave her the authority to request treatment on his behalf. Thompson looked briefly at the Advance Directive and saw that it was signed on the front and back pages. Thompson noted that the second page of the Advance Directive stated, "no extraordinary methods," and concluded that Calvin was "DNR,"[2] meaning that he did not want to be resuscitated by medical professionals. Thompson later acknowledged that he did not have time to fully read the Advance Directive. Thompson then handed the Advance Directive to Stoots and said, "We got to go."

---

[2] "DNR" is shorthand for "Do Not Resuscitate."

Contrary to Thompson's interpretation of the Advance Directive, the second page does not say "no extraordinary methods" anywhere. Rather, the second page states, in relevant part:

1. I provide the following instructions in the event my attending physician determines that my death is imminent (very close) and medical treatment will not help me recover.

[Of the options provided, Calvin selected:]

I do not want any treatments to prolong my life. This includes tube feeding, IV fluids, cardiopulmonary resuscitation (CPR), ventilator/respirator (breathing machine), kidney dialysis, or antibiotics. I understand I will receive treatment to relieve pain and make me comfortable.

2. I provide the following instructions if my condition makes me unaware of myself or my surroundings or unable to interact with others, and it is reasonably certain I will never recover this awareness or ability even with medical treatment:

[Of the options provided, Calvin selected:]

I want treatment for a period of time in the hope of some improvement in my condition. I suggest 2 days as the period of time after which such treatment should be stopped if my condition has not improved.

Stoots told Powell and Thompson that Calvin was not "DNR" and that, as his medical agent, she wanted him to be treated. Powell and Thompson then loaded Calvin into the ambulance and connected him to oxygen. Stoots rode in the front of the ambulance. They drove to the hospital in a non-emergency fashion (i.e., without lights and sirens and stopping to adhere to all traffic signals along their route). They also stopped to pick up Larry Chatham ("Chatham"), an Advanced EMT. This was done because Chatham could provide Advanced Life Support Services.

3

Calvin died in the ambulance on the way to the hospital.[3]  Upon arrival at the hospital, the emergency room staff were informed that no attempt to resuscitate Calvin was made because he had a Do Not Resuscitate Order.  MLSC subsequently generated a "Billing Report" and billed Calvin's insurance for its services.  Calvin's insurance paid an undisclosed amount to MLSC.

In 2016, Stoots brought a wrongful death action against Powell, Thompson, Chatham (collectively, the "Paramedics") and MLSC, alleging that their "reckless, wanton, negligent and grossly negligent conduct . . . was the direct and proximate cause of the premature death of [Calvin]."[4]  In response, the Paramedics and MLSC filed a plea in bar asserting statutory immunity under Code § 8.01-225, as well as sovereign and charitable immunity.[5]  The stipulated facts established that Powell designated his February 9, 2014 shift as a volunteer shift. Additionally, in February 2014, he worked a total of five shifts and received $150 from the MIP. Thompson did not participate in the MIP, as he never worked more than three shifts per month. Chatham worked eight shifts in February 2014 and received $500 from the MIP.  Chatham's timesheet for that month does not contain an entry for February 9, 2014, as he was not scheduled to work on that date.

In a letter opinion, the circuit court found that the Paramedics were "clearly negligent, and probably grossly negligent" in failing to thoroughly read the Advance Directive.  However,

---

[3] It is unclear whether Calvin died before or after Chatham was picked up.

[4] Stoots also brought a negligent training claim against MLSC which was subsequently dismissed as a matter of law.

[5] The Paramedics and MLSC also moved for summary judgment on the basis that the claim was a medical malpractice claim and Stoots failed to comply with the expert certification requirement of Code § 8.01-20.1.  Stoots responded that her claim was not a medical malpractice action, it was a wrongful death claim.  Alternatively, she claimed that an expert certification was not necessary because the alleged acts of negligence lay within the range of a jury's common knowledge and experience.

4

it ruled that they were absolutely immune from liability under Code § 8.01-225(A)(5) because they rendered emergency care in good faith and were not compensated for the care they provided within the meaning of the statute. With regard to MLSC, the circuit court relied on *Linhart v. Lawson*, 261 Va. 30, 34 (2001), and ruled that MLSC was immune from liability because the Paramedics were immune from liability.[6] Stoots moved the circuit court to reconsider its ruling, and, after oral argument, the circuit court issued a letter opinion reaffirming its decision.

Stoots appeals.

## II. ANALYSIS

On appeal, Stoots argues that the circuit court erred in granting absolute immunity to MLSC and the Paramedics because Code § 8.01-225 does not apply to the present case. Specifically, Stoots claims that the statute is inapplicable due to the Paramedics' violation of several statutory provisions. She further insists that the circuit court misconstrued the "good faith" requirement of Code § 8.01-225. Finally, she claims that circuit court overlooked the fact that MLSC and the Paramedics were compensated and, therefore, the statute did not apply to them.

Our analysis of these issues begins by noting that, at common law, there is no general duty to rescue. *See* W. Page Keeton et al., Prosser & Keeton on Torts § 56 at 375 (5th ed. 1984) ("[T]he law has persistently refused to impose on a stranger the moral obligation of common humanity to go to the aid of another human being who is in danger, even if the other is in danger of losing his life."). Further, we have recognized "'[i]t is ancient learning that one who assumes

---

[6] Additionally, the circuit court ruled that Stoots's claim was not a malpractice action. In reaching this conclusion, the circuit court noted that, because the Paramedics and MLSC were immune from liability under Code § 8.01-225, Calvin was not a "patient" under Code § 8.01-581.1 and, therefore, Stoots's claim did not meet the statutory definition of "malpractice." The circuit court did not reach the issues of charitable immunity or sovereign immunity.

to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.'" *Didato v. Strehler*, 262 Va. 617, 628 (2001) (quoting *Nolde Bros. v. Wray*, 221 Va. 25, 28 (1980)). "[T]his common law principle is embodied in the Restatement (Second) of Torts § 323," which states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

*Id.* at 628-29.

Thus, at common law, if an individual undertook to perform rescue operations, that individual was held to a duty of ordinary care. It has been observed, however, that such a state of affairs offers no encouragement for individuals to volunteer to help another in danger; rather, it "operates as a real, and serious, deterrent to the giving of needed aid." Prosser & Keeton on Torts § 56, at 378. Indeed, "[t]he result of all this is that the good Samaritan who tries to help may find himself [punished with] damages, while the priest and the Levite who pass by on the other side go on their cheerful way rejoicing." *Id.*

To encourage voluntary rescue efforts, a majority of states have passed so-called "Good Samaritan" statutes which remove the fear of potential liability from individuals who render aid in emergency situations. *Id.* It is through this lens that we examine Virginia's Good Samaritan statute, Code § 8.01-225. We note that, although the statute includes several subsections, each of which describes the circumstances in which the statute operates to exempt individuals from

6

liability for engaging in certain rescue efforts, this case primarily concerns Code § 8.01-225(A)(5).[7]  This subsection states:

> Any person who . . . [i]s an emergency medical services provider possessing a valid certificate issued by authority of the State Board of Health who in good faith renders emergency care or assistance, whether in person or by telephone or other means of communication, without compensation, to any injured or ill person, whether at the scene of an accident, fire, or any other place, or while transporting such injured or ill person to, from, or between any hospital, medical facility, medical clinic, doctor's office, or other similar or related medical facility, shall not be liable for any civil damages for acts or omissions resulting from the rendering of such emergency care, treatment, or assistance, including but in no way limited to acts or omissions which involve violations of State Department of Health regulations or any other state regulations in the rendering of such emergency care or assistance.

*Id.*

## A.  Violation of Statutory Provisions

Stoots initially argues that the circuit court erred in granting immunity under Code § 8.01-225(A)(5) because the Paramedics' failure to perform CPR or take other steps to save Calvin's life violated several other statutory provisions.  Specifically, Stoots contends that the Paramedics violated statutory duties created under Code §§ 54.1-2982, -2983.3, -2987.1, -2988, and -2901(A)(21).  She contends that Code § 8.01-225(A)(5) has no application in such circumstances, as the statute only immunizes individuals from civil liability for "violations of State Department of Health regulations or any other state regulations," not violations of statutory duties.  We disagree.

---

[7] Although Stoots also raises arguments related to Code § 8.01-225(A)(1), the circuit court's ruling was explicitly limited to Code § 8.01-225(A)(5).  Accordingly, we do not directly address the applicability of Code § 8.01-225(A)(1).  However, we acknowledge that our analysis of the "good faith" and "without compensation" issues would apply equally to both subsections under the facts of this case.

As an initial matter, we note that many of the statutes cited by Stoots do not create a duty of any sort. Code § 54.1-2982 provides the definitions for advance directives and Do Not Resuscitate Orders, among other things. Code §§ 54.1-2987.1 and -2901(A)(21) authorize health care providers to follow a validly executed Do Not Resuscitate Order. Similarly, Code § 54.1-2988 grants immunity to entities and individuals that provide or withdraw healthcare in accordance with a Do Not Resuscitate Order. As the present case does not involve an actual Do Not Resuscitate Order, these statutes have no applicability.

The only statute cited by Stoots that creates a duty of some sort and is potentially applicable here is Code § 54.1-2983.3, which, in addition to providing certain exclusions and limitations regarding advance directives, expressly states that "a patient's advance directive shall otherwise be given full effect." However, the fact that the Paramedics had a statutory duty to give full effect to the Advance Directive does not mean a breach of that duty renders Code § 8.01-225(A)(5) inapplicable. Nothing in the statute supports Stoots's argument that the General Assembly intended to limit the immunity from civil liability only to violations of State Department of Health regulations. Notably, the reference to State Department of Health regulations is prefaced by the phrase: "including *but in no way limited to*." *Id.* (emphasis added). Such language clearly indicates that the language is inclusive, not exclusive. In other words, the reference to State Department of Health regulations does not operate to limit the applicability of Code § 8.01-225. Rather, this language indicates that the statute is meant to encompass any act or omission related to the rendering of care, "including but in no way limited to acts or omissions which involve violations of State Department of Health regulations or any other state regulations." *Id.* As the present case involves an omission related to the rendering of care by emergency medical services providers, i.e., the Paramedics' failure to perform CPR or take other

8

steps to resuscitate Calvin, it is clear that Code § 8.01-225(A)(5) may apply, provided the other statutory requirements are met.

## B. Good Faith

Stoots next argues that the circuit court misconstrued the "good faith" provision of Code § 8.01-225. The main thrust of Stoots's argument is that the Paramedics' purported gross negligence establishes that they were not acting in good faith. Stated differently, Stoots takes the position that good faith and gross negligence are mutually exclusive of each other; the existence of one proves the absence of the other. While this construction may be true in some contexts, we cannot say that it applies here, as other provisions of Code § 8.01-225 indicate that good faith and gross negligence can coexist.

The Court has repeatedly explained that "we presume that [the General Assembly] chose with care the words it used when it enacted the statute we are construing." *Bonanno v. Quinn*, 299 Va. 722, 730 (2021). "[I]t is our duty to interpret the several parts of a statute as a consistent and harmonious whole so as to effectuate the legislative goal." *Virginia Elec. & Power Co. v. Bd. of County Sup'rs of Prince William County*, 226 Va. 382, 387-88 (1983). "Additionally, when the General Assembly includes specific language in one section of a statute, but omits that language from another section of the statute, we must presume that the exclusion of the language was intentional." *Halifax Corp. v. First Union Nat. Bank*, 262 Va. 91, 100 (2001).

Here, we note that Code § 8.01-225(A)(5) and Code § 8.01-225(A)(10)[8] both include the same good faith requirement. However, the latter subsection also carves out an exception for

---

[8] Code § 8.01-225(A)(10) states, in relevant part:
>     Any person who . . . [i]s a volunteer in good standing and certified
>     to render emergency care by the National Ski Patrol System, Inc.,
>     who, in good faith and without compensation, renders emergency
>     care or assistance to any injured or ill person . . . shall not be liable

acts or omissions that were "the result of gross negligence or willful misconduct." The inclusion of this exception in another subsection of the statute necessarily implies that the General Assembly recognized that an individual could act in good faith and simultaneously be grossly negligent. In other words, in the context of Code § 8.01-225, the General Assembly did not intend to equate gross negligence with the absence of good faith, i.e., bad faith. Moreover, we must presume that the General Assembly intentionally excluded this language from Code § 8.01-225(A)(5). *See Halifax Corp.*, 262 Va. at 100.

In the alternative, Stoots argues that "good faith" should be judged by a standard of objective reasonableness.[9] Again, we must disagree. When interpreting a statute, courts "ascertain and give effect to the intention of the legislature." *Boynton v. Kilgore*, 271 Va. 220,

---

> for any civil damages for acts or omissions resulting from the rendering of such emergency care, treatment, or assistance, including but not limited to acts or omissions which involve violations of any state regulation or any standard of the National Ski Patrol System, Inc., in the rendering of such emergency care or assistance, *unless such act or omission was the result of gross negligence or willful misconduct.*

(Emphasis added.)

[9] In raising this argument, Stoots relies on our decisions in *Nationwide Mutual Insurance Co. v. St. John*, 259 Va. 71 (2000) and *CUNA Mutual Insurance Society v. Norman*, 237 Va. 33 (1989). *Nationwide* and *CUNA* both addressed whether an individual could be awarded attorneys' fees and costs due to the insurer's bad faith refusal to pay an insurance claim. The Court adopted a reasonableness standard due to the fact that both cases involved statutes that served both remedial and punitive purposes. *See Nationwide*, 259 Va. at 75 (noting that Code § 8.01-66.1(A) is both remedial and punitive); *CUNA*, 237 Va. at 38 (stating the Code § 38.2-209 "is both punitive and remedial in nature."). Further, the reasonableness standard the Court adopted was specifically tailored to those cases, and therefore has limited applicability in other situations. *See Nationwide*, 259 Va. at 75 (requiring consideration of, among other things, whether reasonable minds could differ in interpreting the insurance provisions, whether a reasonable investigation was made into the insurance claim, and whether the denial of the claim was a negotiation tool); *CUNA*, 237 Va. at 38 (same). The significantly different subject matter and customized holdings of those cases necessarily limit their applicability outside of the context of the relationship between insurer and insured.

227 (2006). At common law, a rescuer's actions were judged by a reasonableness standard, *see Restatement (Second) of Torts* § 323 (holding a rescuer liable "for physical harm resulting from his failure to exercise reasonable care" in performing the rescue), and Code § 8.01-225 was enacted to abrogate the common law. Imposing the reasonableness standard would essentially result in a return to the common law and an implicit vitiation of Code § 8.01-225; therefore, we must reject such a construction of the statute.

This Court has recognized that, in certain contexts, the term "good faith" looks at the intent of the actor. For example, in *Rafalko v. Georgiadis*, 290 Va. 384, 398 (2015), we held that "[a] person acts in good faith when he or she acts with honest motives." Thus, a finding of good faith is "based on the court's determination of the mindset of a party." In contrast, the term "reasonableness" looks at the manner in which the actor performs an act. *See Mayr v. Osborne*, 293 Va. 74, 81 (2017) (recognizing that the tort of negligence functions "to encourage individuals to exercise *reasonable* care.") (emphasis added). In light of the fact that the General Assembly has clearly signaled a move away from looking at the manner the act is performed, we hold that, with regard to Code § 8.01-225, the question of whether an individual has acted in "good faith" is best answered by looking at that individual's mindset at the time the conduct is undertaken.

Here, there is no evidence indicating that the Paramedics had any bad intent or dishonest motives in their failure to treat Calvin, nor has Stoots been able to point to any fact indicating that they bore any ill will toward Calvin. Thus, while it is undisputed that the Paramedics committed a grave mistake in failing to evaluate the Advance Directive more thoroughly, that mistake, without more, cannot rise to the level of bad faith. Accordingly, the circuit court did not err in finding an absence of bad faith.

11

C. Without Compensation

Stoots further argues that the circuit court erred in ruling that the Paramedics and MLSC were not compensated for their actions in this case. With regard to the Paramedics, she contends that the circuit court improperly limited its focus to whether Powell and Chatham were paid for the February 9, 2014 shift.[10] According to Stoots, this case turns on the fact that Powell and Chatham participated in the MIP, which permitted them to designate whether a shift was a volunteer shift or a paid shift. Stoots insists that the MIP could not have been what the General Assembly intended when it said "without compensation" because the MIP allowed Powell and Chatham to claim immunity on any day in which there was an adverse occurrence while also getting paid on other days. We disagree.

"When the language of a statute is unambiguous, we are bound by the plain meaning of that language." *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007). By its plain language, Code § 8.01-225(A)(5) only requires that an emergency medical services provider render emergency care "without compensation." Such language presents a simple dichotomy: either a person receives compensation for their actions and may be held liable, or does not receive compensation and is immune from liability. Thus, in direct contravention to Stoots's argument, the statute does not look at whether a person *could be compensated* for their actions; rather, it looks at whether the person is, in fact, compensated.

In the context of Code § 8.01-225(A)(5), the term "compensation" means "[r]emuneration and other benefits received in return for services rendered; esp., salary or wages." Black's Law Dictionary 354 (11th ed. 2019). Here, there is no evidence that any of the

---

[10] Stoots implicitly recognizes that her argument could not apply to Thompson, as the record establishes that he did not participate in the MIP and never received any money from MLSC.

12

Paramedics received any form of compensation for their actions on February 9, 2014. Accordingly, the circuit court did not err in finding that the Paramedics acted without compensation.[11]

With regard to MLSC, Stoots takes issue with the circuit court's ruling that MLSC's liability is coterminous with the Paramedics' liability. She contends that MLSC's liability is independent of the Paramedics' liability, especially considering the fact that the circuit court expressly found that MLSC billed and "was paid by [Calvin's] insurance company." To the extent that the circuit court ruled that MLSC's liability was coterminous with the Paramedics' liability, we agree with Stoots that the circuit court erred.

"It is well settled in Virginia that where [principal] and [agent] are sued together in tort, and the [principal's] liability, if any, is solely dependent on the [agent's] conduct, a *verdict* for the [agent] necessarily exonerates the [principal]." *Roughton Pontiac Corp. v. Alston*, 236 Va. 152, 156 (1988) (emphasis added). In other words, the liability of a principal is only coterminous with the liability of its agent "when a verdict or other finding that the [agent] *was not negligent* is the basis for exoneration of the [principal]." *Hughes v. Doe*, 273 Va. 45, 48 (2007) (emphasis added, internal citations omitted).[12]

> We have never applied this principle to claims against [a principal] when the [agent] was dismissed with prejudice on a plea in bar or other procedural matter. This limited application reflects the fact

---

[11] As the record establishes that the Paramedics were not compensated at all for their actions on February 9, 2014, we do not reach the issue of whether Code § 8.01-225(E)(1) would exempt the money the Paramedics received under the MIP from the definition of compensation.

[12] We note that *Linhart*, the case cited by the circuit court, involved the General Assembly's abrogation of sovereign immunity for the principal but not the agent. 261 Va. at 34. As the present case does not involve a similar abrogation of immunity, that case is inapposite and the circuit court's reliance on it was misplaced.

that the crux of respondeat superior liability is a finding that the [agent] was negligent.

*Id.*

It is further worth noting that a plaintiff is not required to bring a claim against the agent to maintain a respondeat superior theory claim against the employer. *Id.*

In the present case, there was no finding that the Paramedics were not negligent. Indeed, the circuit court unequivocally reached the opposite conclusion, stating "[c]learly [the Paramedics] were negligent or even grossly negligent, in not reading, understanding, and interpreting [Calvin's] Virginia Advance Directive for Health Care and in not attempting to resuscitate [Calvin]." As there was no verdict in favor of the Paramedics, or finding that they were not negligent, their immunity from civil liability is not dispositive of whether Code § 8.01-225 applies to MLSC. Accordingly, the circuit court erred in ruling that MLSC was immune because the Paramedics were immune.

Having reached this conclusion, we note that the record appears to be insufficient to determine whether the immunity afforded by Code § 8.01-225 applies to MLSC. As Stoots points out, MLSC billed and was paid by Calvin's insurance company. However, the record is silent as to the nature of the bill or the subsequent payment; therefore, we cannot presently determine whether the payment was compensation for services rendered or reimbursement for MLSC's expenses. *See* Code § 8.01-225(E)(v) ("'[C]ompensation'" shall not be construed to include . . . expenses reimbursed to any person providing care or assistance pursuant to this section."). Thus, whether MLSC's actions were "without compensation" cannot be decided on the present appeal.

14

III.   CONCLUSION

For the foregoing reasons, the circuit court's judgment with regard to the Paramedics will

be affirmed.  However, we will reverse the circuit court's judgment with regard to MLSC and

remand the case for further proceedings.[13]

*Affirmed in part,*
*reversed in part,*
*and remanded.*

---

[13] In light of our ruling, the circuit court will need to revisit its ruling on whether Stoots's claim meets the statutory definition of "malpractice" under Code § 8.01-581.1 and, if so, whether the alleged acts of negligence lay within the range of a jury's common knowledge and experience such that she was not required to comply with the expert certification requirement of Code § 8.01-20.1.