PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

LATISHA S. CASTILLO,
                    *Plaintiff-Appellant,*

v.

EMERGENCY MEDICINE ASSOCIATES,
P.A.,
                    *Defendant-Appellee,*

                    and

JOHN/JANE DOE, MD; PRINCE
WILLIAM HOSPITAL,
                    *Defendants.*

No. 03-1564

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-02-1167-A)

Argued: January 21, 2004

Decided: June 17, 2004

Before MOTZ, GREGORY, and DUNCAN, Circuit Judges.

___

Affirmed by published opinion. Judge Duncan wrote the majority
opinion, in which Judge Motz joined. Judge Gregory wrote a dissent-
ing opinion.

___

## COUNSEL

**ARGUED:** Martin Trpis, ASHCRAFT & GEREL, Washington,
D.C., for Appellant. Thomas M. Wochok, HAMILTON ALTMAN

CANALE & DILLON, L.L.C., Fairfax, Virginia, for Appellee. **ON BRIEF:** Wayne M. Mansulla, ASHCRAFT & GEREL, Washington, D.C., for Appellant. Stephen L. Altman, HAMILTON ALTMAN CANALE & DILLON, L.L.C., Fairfax, Virginia, for Appellee.

## OPINION

DUNCAN, Circuit Judge:

Appellant Latisha S. Castillo ("Castillo") challenges the district court's granting Appellee Emergency Medicine Associates, P.A.'s ("EMA") motion for summary judgment, on the ground that her medical malpractice claim is barred by Virginia's applicable statute of limitations. Castillo argues that the district court erred in failing to view the evidence in the light most favorable to her, and in finding that the continuing treatment doctrine did not apply to toll the statute of limitations. Because we conclude that the claim is indeed time-barred and that the district court did not err in granting the motion for summary judgment, we affirm.

I.

Castillo came to the emergency department of Prince William Hospital on October 10, 1999, complaining of lower abdominal pain and several months' history of severe nausea and abdominal pain with bloating. An unidentified emergency department physician ("Dr. Doe") diagnosed Castillo with a urinary tract infection. Dr. Doe prescribed antibiotics and discharged Castillo that same day. Upon discharge, Castillo was provided with the following Emergency Services Department Discharge Instructions:

> The examination and treatment you received today in the Emergency Services Department has been rendered on an emergency basis. It is not intended to be a substitute for comprehensive medical attention. SHOULD YOUR CONDITION WORSEN, ANY NEW SYMPTOMS DEVELOP, OR YOU NOT RECOVER AS EXPECTED, PLEASE CONTACT THE DOCTOR YOU WERE GIVEN FOR

FOLLOW-UP CARE (listed below). *If you cannot reach the doctor*, return to the Emergency Services Department. You should return immediately to the nearest emergency room for any emergency.

J.A. 75 (emphasis added). The follow up care specifically refers Castillo first to her "own MD in North Carolina" or a follow-up with "Dr. Wall for recheck in 3-4 days if not better." *Id.* Dr. Wall is a gynecologist who works at Prince William Hospital, but is *not* employed by EMA. The Instructions go on to emphasize as follows: "*It is important that you follow up with the doctor listed above* [i.e., her own doctor or Dr. Wall] *for a re-examination. Id.* (emphasis in the original).

On October 14, 1999, Castillo called the emergency department because her condition had not improved. Initially, she asked to speak with Dr. Wall. When Dr. Wall could not be reached, Castillo spoke with an unidentified emergency department physician, who prescribed a new medication over the telephone. On October 19, 1999, Castillo returned to the emergency department, complaining of severe acute abdominal pain, fever, and chills. She was seen by Dr. James Eskew, who admitted her to the hospital. On that day, Castillo underwent surgery for treatment of abdominal adhesions and infected abscesses in the pelvic area, which had resulted from soilage due to a perforated intestine. All of the emergency department physicians who treated Castillo were employed by EMA.

Castillo filed the original complaint on October 19, 2001. That complaint was voluntarily dismissed, and Castillo filed an amended complaint on August 7, 2002. The amended complaint alleged that EMA is liable for the acts and omissions of its agents, including Dr. Doe, and that Dr. Doe was negligent in his treatment of Castillo on October 10, 1999. EMA moved for summary judgment on the ground that Castillo failed to bring her cause of action for medical malpractice within two years of the date it accrued. Castillo argued that there existed a genuine issue of material fact regarding the date of the onset of her injury, and therefore a grant of summary judgment was improper. Further, Castillo contended that the district court should apply the continuing treatment doctrine to toll the statute of limitations while she was under the care of physicians employed by EMA.

For both these reasons, Castillo argued that her cause of action was not time-barred.

The district court found that no genuine issue of material fact existed as to the timing of the injury, and that the continuing treatment doctrine did not apply. Specifically, with respect to the continuing treatment theory, the court found that the physician-patient relationship between Castillo and Dr. Doe terminated upon her discharge from the Emergency Department on October 10, 1999, and so, necessarily, did her physician-patient relationship with EMA. Thus, the district court found that the statute of limitations barred Castillo's cause of action and granted EMA's motion for summary judgment.

## II.

We review a district court's grant of a motion for summary judgment *de novo*. *See Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997). To prevail on a motion for summary judgment, a party must show (1) there is no genuine issue of material fact; and (2) it is entitled to judgment as a matter of law. *Id.* at 190. In reviewing the evidence, we draw all reasonable inferences in favor of Castillo, the non-moving party. *Thompson v. Aluminum Co. of Am.*, 276 F.3d 651, 656 (4th Cir. 2002).

As a federal court sitting in diversity, we interpret and apply the substantive law of the state in which the action arose. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In this case, the Virginia statute of limitations applies. *See Rowland v. Patterson*, 852 F.2d 108, 110 (4th Cir. 1988) ("Federal courts sitting in diversity generally apply state statutes of limitations.").

The applicable Virginia statute of limitations states that "every action for personal injuries, whatever the theory of recovery . . . shall be brought within two years after the cause of action accrues." Va. Code Ann. § 8.01-243(A) (Michie 2003). Under Virginia law, the statute of limitations for personal injury begins to run when the wrong is committed, rather than on the date the injury is discovered. *See* Va. Code Ann. § 8.01-230 (Michie 2003)("[T]he right of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the

person . . . ."); *Caudill v. Wise Rambler, Inc.*, 168 S.E.2d 257, 259-60 (Va. 1969) (finding that the right to recover damages for personal injuries accrues at the time a person is injured).

In this case, the original complaint was filed on October 19, 2001. Therefore, in order for the cause of action to fall within the two-year statute of limitations, the injury must have been sustained on or after October 19, 1999, or the limitations period must have been tolled.

### A.

Castillo contends that an issue of material fact existed regarding the date of injury, and that a reasonable jury could find that the injury began on or after October 19, 1999. She argues that a grant of summary judgment was therefore improper.

In making her argument, Castillo contends that the actionable injury resulted from the adhesions and fistulas caused by the intra-abdominal scarring that happened when an intestinal perforation was allowed to seal on its own instead of being treated. Since the scarring occurred after the sealing of the perforation, and the sealing was complete by the time corrective surgery was performed on October 19, 1999, Castillo argues that the scarring could have started after that date.

To support this contention, Castillo offered the opinion of Dr. Eric Munoz, her expert on causation and damages. During his deposition, Dr. Munoz opined that the intestinal perforation sealed "[s]ome time before [October] 20 but no one could say." J.A. 103-04. Castillo contends that based on this testimony, a reasonable juror could find that the scarring process occurred on or after October 19, 1999.

However, the following colloquy also occurred during Dr. Munoz's deposition:

Q: [Castillo] presents on October 10 and you are saying that between the tenth and the twelfth is basically the time frame within which to meet the standard of care?

A: Correct.

Q:    And after the twelfth she begins to receive some physical damage from the lack of intervention?

A:    Yes.

Q:    Let me put it this way: On October 13, 1999 to a reasonable degree of medical certainty, in your opinion, because interventions weren't performed she has suffered physical damage?

A:    Yes.

Q:    And that the physical damage became exacerbated day by day until she actually received the care?

A:    Correct.

J.A. 105-06. Additionally, during the depositions of Castillo's other expert witnesses, Drs. Soloman Shah and David Munter, each opined that the damage from the perforated intestine began before October 19, 1999.[1] Further, in her memorandum to the district court in opposi-

---

[1]From the deposition of Dr. Shah:

Q:    And, Doctor, you also believe to a reasonable degree of medical certainty therefore that as each day passes after October 10, 1999, until the surgery is actually done, that her infection grew and spread so that more and more of the peritoneal space became involved with this infection?

A.    Correct.

J.A. 85.

From the deposition of Dr. Munter:

A:    [Reading from his report] At the time of her evaluation on October 10th, 1999 in the emergency services department of Prince William Hospital in Manassas, Virginia, Ms. Castillo had an intraabdominal [sic] infectious process as evidenced by her history, physical examination, and laboratory test.

J.A. 96-97.

tion to EMA's motion for summary judgment, Castillo states that "[o]n October 10, 1999, [she] had either a perforation of her intestine or she had and [sic] acute appendicitis." J.A. 112.

Each of Castillo's three witnesses agrees that medical intervention should have begun on October 10, 1999, on her first visit to the emergency department.[2] Further, they agree that the onset of the injury occurred sometime before October 19, 1999.

---

[2]From the deposition of Dr. Munoz:

Q: By when should those interventions have been done to greatly lessen her morbidity and damages?

A: Within the first 24 to 48 hours of her admission to Prince William Hospital . . . .

J.A. 101.

From the deposition of Dr. Shah:

Q: So you also believe to a reasonable degree of medical certainty that had [the standard of care been met on] October 10, 1999, it would have prevented the growth and spread of her infection? For example, on October 11, 1999, had the surgery been done — okay? — the extent of the physical damage to her would have been less than it actually was —

A: Correct.

Q: — on the date the surgery was done?

A: Correct.

J.A. 85.

From the deposition of Dr. Munter:

A: [Reading from his report] If an abdominal and pelvic computed tomography scan had been obtained on Ms. Castillo on October 10th, 1999, it would have demonstrated an intraabdominal [sic] infectious process. In this case, the standard of care for emergency medicine would have required an immediate surgical consultation and the administration of intravenous antibiotics in the emergency services department.

J.A. 98.

Thus, even under Castillo's version of the sequence of events, her focus on when the scarring process might have started is misplaced. The physical injury which led to the infections and the scarring occurred and worsened when her intestinal perforation went untreated during the period before October 19, 1999, more than two years prior to the running of the statute of limitations.

### B.

Alternatively, Castillo argues that the continuing treatment doctrine applies, and that the statute of limitations was tolled when treatment began on October 10, 1999. Virginia courts agree that the continuing treatment doctrine tolls the running of the statute of limitations while a patient is undergoing a "continuous and substantially uninterrupted course of examination and treatment" for a particular ailment. *Farley v. Goode*, 252 S.E.2d 594, 599 (Va. 1979). In order for the continuing treatment doctrine to apply, a physician-patient relationship must exist over the course of treatment. *See Grubbs v. Rawls*, 369 S.E.2d 683, 686 (Va. 1988)("Part of our rationale in *Farley* was that as long as the physician-patient relationship continued as to a particular malady or injury, then it could not be said that treatment had ceased."). Thus, in order for the continuing treatment to toll the statute of limitations in this case, there must have been a physician-patient relationship between Castillo and EMA that continued from her first treatment by Dr. Doe on October 10, 1999 until October 19, 1999.

Virginia's highest court has not addressed whether the continuing treatment doctrine applies in a situation such as this, when a patient is treated by different emergency room physicians during separate incidents, and those physicians are employed by the same association. When there is no decision by the highest state court, a federal court "must apply what [it] find[s] to be the state law after giving proper regard to relevant rulings of other courts of the State." *Barnes v. Thompson*, 58 F.3d 971, 982 (4th Cir. 1995) (internal quotation omitted). We therefore turn to a consideration of relevant Virginia law.

Virginia courts have found that a "physician's duty arises only upon the creation of a physician-patient relationship; that relationship springs from a consensual transaction, a contract, express or implied, general or special . . . ." *Lyons v. Grether*, 239 S.E.2d 103, 105 (Va.

1977) (citation omitted). The physician-patient relationship generally exists between an individual physician and his or her patient, arising when a patient entrusts his or her care to a physician and the physician accepts responsibility for that care. *Id.*

When an individual is treated by more than one physician for the same ailment, that individual has separate physician-patient relationships with each physician, and the continuing treatment doctrine applies separately to treatment by each physician. *See Hewlette v. Proffer*, 55 Va. Cir. 387, 389-90 (2001) ("*Grubbs* does not provide a separate standard for a 'joint treatment' situation; the statute of limitations was determined for each physician separately and independently of their joint treatment of the plaintiff."). The application of the continuing treatment doctrine requires more than the continuous treatment of a single ailment; the physician-patient relationship must be continuous as well. In *Hollingsworth v. Shenandoah Medical Imaging, Inc.*, 38 Va. Cir. 324 (1996), a patient brought a medical malpractice action against individual physicians and a radiology clinic for misdiagnosing breast cancer. The patient claimed that cancer should have been seen in a mammogram taken in June of 1990. She filed a complaint in September of 1993. The circuit court held that the statute of limitations barred the action, finding that two isolated x-ray readings by a radiologist did not constitute continuing treatment. The circuit court stated that

> [some] jurisdictions focus on the course of treatment without the additional requirement of the continuing individual physician-patient relationship. While the Virginia Supreme Court is cognizant of such authorities, . . . it has consistently focused on both the individual physician-patient relationship as well as the continuous course of treatment and held that both are requirements for the continuous treatment exception to apply.

*Id.* at 333 (citation omitted). It is important to note, however, that Virginia courts have found that treatment by subsequent physicians does not interrupt the original treatment for statute of limitations purposes where 1) the first physician referred the patient to the other physicians, and (2) the first physician, who committed the malpractice, continued to treat the patient for the same condition. *See Justice v.*

*Natviq*, 381 S.E.2d 8, 10 (Va. 1989) (finding that the continuing treatment doctrine applied even though there had been eight years of nonnegligent treatment by the physician since the negligent act, and during that time the plaintiff had seen two other physicians for treatment of complications created by the negligent act).

To address Castillo's claim, we must preliminarily determine whether the continuing treatment doctrine can be applied to a corporation. Castillo contends that a physician-patient relationship may exist between EMA and an individual, and her assertion is correct. The Virginia Supreme Court cites the Medical Malpractice Act as providing that there is no legal distinction between individual and organizational health care providers.[3] *See Pulliam v. Coastal Emergency Servs. of Richmond, Inc.*, 509 S.E.2d 307, 320 (Va. 1999)(finding that a corporation created to provide emergency physicians to staff emergency departments was a health care provider as defined by Va. Code Ann. § 8.01-581.1(vi)). Further, the Virginia Supreme Court has found that a physician-patient relationship can exist between an individual and a professional corporation that is a health care provider as defined by section 8.01-581.1. *See Didato v. Strehler*, 554 S.E.2d 42, 46 (Va. 2001), (finding that where the plaintiffs engaged a professional corporation "to provide all health care that a family should receive from . . . a professional corporation engaged in providing health care services relating to the practice of pediatrics," such an agreement was sufficient to create a direct physician-patient relationship between the plaintiffs and the corporation). The analysis of whether the continuing treatment doctrine applies in such situations would appear to be substantially the same as when an individual physician-patient relationship is involved: whether there was an ongoing physician-patient relationship with the corporate health care provider, and whether the patient was undergoing a continuous and substantially uninterrupted course of treatment for the same ailment.

---

[3]Va. Code Ann. § 8.01-581.1 (Michie 2003) ("'Health care provider' means (i) a person, corporation, facility or institution licensed by this Commonwealth to provide health care or professional services as a physician or hospital . . . (vi) a corporation, partnership, limited liability company or any other entity, except a state-operated facility, which employs or engages a licensed health care provider and which primarily renders health care services . . . .").

Castillo does not allege the existence of a direct physician-patient relationship between herself and EMA, however. Rather, she attempts to take the analysis one step further. Castillo argues that an indirect relationship arose with EMA through her interactions with its unnamed physician-employees. Virginia law does not take us this far.

It is undisputed that all three emergency department physicians with whom Castillo had contact were employed by EMA.[4] It is also undisputed that treating Castillo was within the scope of each of the emergency department physician's agency.[5] However, the further determination that the existence of a physician-patient relationship with the individual employees provides a basis for asserting the continuing treatment doctrine against the corporate health care provider that employs them is one we need not make on these facts. Even if Virginia law clearly allowed Castillo to reach EMA because of the continuing care of its physician-employees, we conclude that the discrete and isolated nature of the emergency room contacts in this case do not support such a claim.

Castillo saw two different emergency department physicians during two isolated visits more than a week apart, on October 10, 1999 and October 19, 1999. A third intervening contact occurred when she called the emergency department and spoke over the telephone with a third, unknown physician on October 14, 1999. There is no allegation that the three emergency department physicians consulted about the care of Castillo, nor is there evidence of such in the record. Dr. Doe did not refer Castillo to the subsequent emergency department physicians who treated her. To the contrary, Castillo was urged to seek follow up care from her "own MD" or others should her condition not improve. J.A. 75. None of the three emergency department physicians is Castillo's regular physician. Further, the Emergency Services Department Discharge Instructions given to Castillo on October 10, 1999 explicitly state that "[t]he examination and treatment you received today in the Emergency Services Department *has been rendered on an emergency basis. It is not intended to be a substitute for comprehensive medical attention*." J.A. 75 (emphasis added).

---

[4]*See* J.A. 29, Answer ¶ 3.

[5]*See id.*

Although the Instructions provided that Castillo was to "return to the Emergency Services Department" if she could not reach the appropriate physician for follow-up care, they further stated that she "should return immediately *to the nearest emergency room* for any emergency." *Id.* (emphasis added).[6] Castillo could have no reasonable expectation of an ongoing physician-patient relationship. As such, Castillo did not contract for continuing care with Dr. Doe or EMA.

In fact, in one of the cases relied on by the district court, a Virginia circuit court found that while a physician's acts may bind a hospital,

> [w]here the patient is not completely recovered on discharge, the patient's continuing care obligations are assumed by the patient's treating physician for whom the hospital is generally not responsible. While the hospital may be held liable for acts of physicians employed by it, this does not mean that the hospital is also providing continuing care to the patient after the patient leaves the hospital.

---

[6]The dissent construes the Emergency Services Department Discharge Instructions as having "instructed Castillo to return for follow up care . . . ." *Post* at 16. This is a mischaracterization of the Instructions.

As noted *supra*, the Instructions direct Castillo to *first* seek follow up care from her "own MD in North Carolina" or a physician *not* employed by EMA. J.A. 75. The Instructions go on to stress, in underlined type, the importance of following up with her "own MD" or the non-Emergency Services physician, Dr. Wall. Only then, if Castillo "cannot reach th[ose] doctor[s]," do the Instructions state that Castillo should return to the Emergency Services Department. *Id.* It could not be clearer from the Instructions that returning to Emergency Services is provided as the option of last resort.

Further, the language on which the dissent relies must be read in the context of the first two sentences of the Instructions which the dissent fails to address: "The examination and treatment you received today in the Emergency Services Department has been rendered on an emergency basis. It is not intended to be a substitute for comprehensive medical attention." *Id.*; *supra*. Read as a whole, the Instructions clearly inform Castillo that she received solely emergency care, and that only should another emergency occur and she is unable to reach her regular or follow-up physician is she to return to Emergency Services.

*Pidgeon v. Wake*, 34 Va. Cir. 336, 341 (1994) (citation omitted). While there were three discrete instances with respect to which EMA owed Castillo the duty attendant to a physician-patient relationship, that relationship was neither coordinated nor continuous. Castillo's isolated visits and contact with emergency department physicians were insufficient to establish the ongoing physician-patient relationship required for the application of the continuing treatment doctrine.

Virginia's circuit courts have reached similar decisions. In *Merritt v. Clark*, 40 Va. Cir. 13 (1995), the circuit court found that examinations by two different emergency room doctors, both employed by the same association, did not constitute continuous and uninterrupted treatment.[7] In that case, as in the instant case, a patient was seen in an emergency room in two separate incidents and by two different doctors, neither of whom was the patient's regular physician. The court found such isolated visits insufficient for the application of the continuing treatment doctrine. We note that Castillo did not address *Merritt*

---

[7]The dissent states that we rely on *Merritt*, which it finds to be inapposite, to reach our holding in this case. *Post* at 14. In fact, we rely on the foregoing extensive analysis of Virginia case law, including *Merritt*, to reach the decision. We are unable to find any cases, and the dissent cites to none, that apply the "continuing care" doctrine in the context of emergency room care. *See*, *e.g.*, *Pidgeon*, specifically noting that an emergency room physician is "employed to provide emergency room services to patients, not continuing care." 34 Va. Cir. at 341.

Further, we do not agree that *Merritt* in inapplicable. It is true, as the dissent points out, that the patient in *Merritt* was discharged from the hospital by order of her regular doctor between the emergency room visits. As we have noted, however, recourse to her "own MD" was the course of action urged upon Castillo as well. Further, the court in *Merritt* made no reference to the intervening discharge in reaching its conclusion. Instead, on facts very similar to those presented here, involving a patient who came to an emergency room to be treated for chest pains, was discharged, and returned to the emergency room again complaining of chest pains, the court found as follows: "Here, there are two isolated incidents, involving two different doctors in emergency room situations. Neither of these doctors were the patient's regular practitioner, nor were the visits continuous. Upon that background, the Court holds these facts insufficient to prove the continuing treatment doctrine applicable." 40 Va. Cir. at 15.

in her brief, citing an inability to locate the case. Additionally, in *Pidgeon*, the circuit court found that an emergency room physician is employed to provide emergency care, and "not continuing care." *Id.* at 341. Relying on these cases, the district court gave proper regard to the relevant rulings of the Virginia circuit courts when it determined that the continuing treatment doctrine does not apply on these facts.

III.

For the foregoing reasons, the district court did not err when it found the action to be barred by the two-year statute of limitations, and the judgment of the district court is affirmed.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

The majority holds that Castillo was not entitled, as a matter of law, to invoke the continuous treatment doctrine to toll Virginia's two year statute of limitations for medical malpractice causes of action. I respectfully dissent from this holding for two reasons. First, I believe that *Merritt v. Clark*, 40 Va. Cir. 13 (1995), 1995 WL 17015552, at *1, the case upon which the majority relies to reach this holding, is factually distinguishable and thus inapplicable. Second, I believe, as will be discussed below, that Castillo did in fact receive continuous treatment from EMA and was thus entitled to toll Virginia's statute of limitations for medical malpractice suits.

In *Merritt*, Florence Stansel, the decedent, went to Mount Vernon Hospital on November 30, 1992 complaining of chest pains. Dr. Ford, a doctor who was employed by Capital Emergency Associates, examined and admitted Stansel into the hospital, where she remained until December 1, 1992. On that same day, Stansel was discharged from the hospital "by order of her *regular* doctor, Dr. Clark." *Id.* at *1. Stansel, however, returned to the hospital on December 4, 1992, again complaining of chest pains, and was examined by Dr. Palace, another Capital Emergency Associates physician. Later that day, Stansel suffered a heart attack and died.

The administratrix of Stansel's estate, Merritt, filed a wrongful death and medical malpractice claim against Capital Emergency Associates and Dr. Ford on December 2, 1994. A Virginia trial court, however, held that this claim was barred by Virginia's two year statute of limitations. In so holding, the court concluded that Merritt was not entitled to toll the statute of limitations because she failed to establish continuous treatment. The court reached this conclusion because "there [were] two isolated incidents, involving two different doctors in emergency situations. . . . Neither [of whom were] the patient's regular practitioner, *nor were the visits continuous*." *Id.* at *2 (emphasis added).

Stansel's visits to the emergency room on November 30 and December 4, 1992 were not continuous, because in the interim Stansel was treated, and in fact, discharged from the hospital by her regular physician. The intervention of Stansel's emergency treatment by her regular physician transformed her return trip to the emergency room on December 4th into a discrete emergency visit. On December 4th, Stansel was seeking emergency services for acute chest pains. And, as the majority recognizes in its opinion, "[w]here the patient is not completely recovered on discharge, the patient's continuing care obligations are assumed by the patient's treating physician. . . ." *Ante*, at 12 (quoting *Pidgeon v. Wake*, 34 Va. Cir. 336, 341 (1994)).

The facts of the instant case are quite different from those in *Merritt*. Upon being released-from Prince William Hospital's emergency services department, Castillo was presented with three options in her discharge instructions: "(1) Should your condition worsen, any new symptoms develop, or you not recover as expected, please contact the doctor you were given for follow up care; (2) If you cannot reach the doctor, return to the Emergency Services Department; (3) You should return immediately to the nearest emergency room for any emergency." *Ante*, at 2-3. For follow up care, Castillo was referred to her "own MD in North Carolina"* or to a Prince William Hospital gynecologist, Dr. Wall, for "recheck in 3-4 days if not better." *Ante*, at 3.

---

*The EMA physicians at the Prince William Hospital were made aware upon Castillo's first visit to the emergency department that she was a North Carolina resident who was visiting Virginia at the time of her illness.

The majority concedes that Castillo called the Prince William Hospital emergency department on October 14, 1999, not for emergency care, but "because her condition had not improved." *Ante*, at 3. During that phone call, Castillo attempted to reach Dr. Wall, as instructed by her October 10, 1999 discharge sheet. Dr. Wall, however, was unavailable at that time, and thus another EMA physician provided Castillo with follow up treatment and prescribed her a different type of medication. In doing so, this EMA physician instructed Castillo "to follow up with Dr. Wall or return to the emergency services department if [she] didn't [feel] better." J.A. 72. Accordingly, when her condition did not improve, Castillo returned to Prince William Hospital's emergency department on October 19, 1999 for additional follow up treatment. Despite these facts, the majority erroneously concludes that the treatment rendered by the Prince William Hospital's emergency services department consisted of "discrete and isolated" contacts. *Ante*, at 11.

In my view, rather than being "discrete and isolated" contacts, Castillo's visit on October 10th, phone call on October 14th, and follow up visit on October 19th, were all part of EMA's continuous treatment of Castillo's original illness. Unlike in *Merritt*, Castillo was not treated by her regular physician, or any physician other than an EMA physician, during the period that she was treated by EMA. Moreover, EMA's instructions to Castillo clearly indicated that its treatment of Castillo's illness would be continuous. The fact that Castillo was not *required* to follow up with the same physician or with EMA does not, as the majority concludes, alter the continuous nature of this treatment. The fact remains that EMA instructed Castillo to return for follow up care, Castillo sought and received this follow up care for the same illness and Castillo never was treated by an independent physician. Under these circumstances, I believe that there is little doubt that Castillo received continuous treatment from EMA and was thus entitled to toll Virginia's two year statute of limitations.

For the foregoing reasons, I respectfully dissent from the majority's holding.