**Curtis James JACKSON III, p/k/a 50 Cent, Plaintiff,**

**v.**

**IRIS.COM, Defendant.**

**No. 1:07CV961.**

United States District Court, E.D. Virginia, Alexandria Division.

Dec. 19, 2007.

Anne Madeline Devens, Richard Dean Holzheimer, Jr., Reed Smith LLP, Falls Church, VA, for Plaintiff.

Barbara Susan Wahl, Karen Ellis Carr, Arent Fox LLP, Washington, DC, for Defendant.

## OPINION AND ORDER

ROBERT G. DOUMAR, District Judge.

On May 15, 2007, Iris.com ("Defendant" or "Iris") filed a Demand for Arbitration with the American Arbitration Association ("AAA") against Curtis James Jackson III, p/k/a/ 50 Cent, ("Plaintiff" or "Jackson"). On August 30, 2007, Jackson filed a Complaint to Stay the Arbitration and for Declaratory Judgment. On October 11, 2007,

Jackson filed a Motion for a Preliminary Injunction to Stay Arbitration. The arbitration is scheduled for January 21–23, 2008. On December 5, 2007, this Court notified the parties of its intent to consider entering summary judgment *sua sponte* for the Defendant and advised the Plaintiff to submit any additional evidence. For the reasons set forth herein, the Court hereby **DECLARES** that the claims against the Plaintiff are subject to arbitration, **GRANTS** summary judgment *sua sponte* for the Defendant, and **DISMISSES** the case without prejudice to any claims presented in arbitration.

## *DISCUSSION*

### I. FACTUAL AND PROCEDURAL BACKGROUND

The essential facts of this case are not in dispute and are contained in affidavits and exhibits accompanying the parties' various filings. Iris was responsible for producing the "Night of Music" concert series, an event scheduled to take place on July 15, 2006, in Libreville, Gabon, Africa. (Walker Aff. ¶ 3–4.) On February 22, 2006, Iris entered into two separate contracts with G*Town Entertainment, Inc. ("G*Town") whereby G*Town agreed to "furnish the services of" performers Jackson and Melissa Arnette Elliot, p/k/a Missy Elliot ("Elliot") at the July 15, 2006, concert. (Pl.'s Comp. Ex. A1, A2.) Iris paid a total of $550,000 to G*Town in exchange for the performances: $350,000 pursuant to the contract for Jackson ("G*Town Contract") and $200,000 pursuant to the contract for Elliot. (Walker Aff. ¶ 9.) The G*Town Contract contains an arbitration provision, which states:

> Any claim or dispute arising out of or relating to the Agreement or the breach thereof shall be settled by arbitration in Virginia. Virginia [sic] in accordance with the rules and regulations than [sic] obtaining of the American Arbitration Association governing three-member panels. The parties hereto agree to be bound by the award in such arbitration and judgment upon the award rendered by the arbitration may be entered in any court having jurisdiction thereof.

(Def. Opp. Ex. 1B ¶ 13.) The G*Town Contract also contains a liquidated damages provision which states that the $350,000 "payment shall be deemed a non-refundable deposit if [Iris] breeches the terms of the agreement or if [Jackson] breeches the terms of this agreement [Iris] will be refunded his/her deposit minus an [sic] (five percent) 5% commission." (Def. Opp. Ex. 1B ¶ a.) Pursuant to the contracts, G*Town paid $450,000 to American Talent Agency ("ATA"), a booking agent for Jackson and Elliot, in two installments: $45,000 on May 24, 2006, and $405,000 on June 8, 2006. (Pl.'s Nov. 30 Sub. Ex. 1.) G*Town allegedly retained the remaining $100,000 as a commission. (Def.'s Opp. n. 2.) ATA then paid $150,000 to Jackson on June 28, 2006, and $75,000 to Elliot on June 30, 2006. (Pl.'s Nov. 30 Sub. Ex. 1.) Plaintiff has allegedly been unable to locate the remaining $225,000 paid to ATA. (Pl.'s Nov. 30 Sub. ¶ 4.)

While the above essential facts are fairly straightforward, the facts regarding the breakdown in negotiations between the parties are somewhat more complex. As a threshold matter, the parties do not dispute that ATA was Jackson's booking agent. Violator Management ("Violator"), Jackson's manager, admits that it "engaged" ATA to negotiate for Jackson's performance in Africa. (Lighty Aff. ¶ 6.) In addition, negotiations between Iris and Jackson over Jackson's performance in Africa appear to have proceeded in two distinct stages. The first stage involved Iris indirectly negotiating with ATA using G*Town as an intermediary, whereas the

second stage involved Iris directly negotiating with ATA.

At the first stage, Iris entered into the contract with G*Town containing the arbitration provision at issue, and G*Town proceeded to negotiate with ATA for Jackson's performance. G*Town's negotiations with ATA are memorialized in several documents submitted by the parties including:

1. A May 14, 2006, letter from ATA to G*Town discussing G*Town's offer of $300,000 for Jackson's performance. (Def.'s Opp. Ex. 2.)

2. A June 9, 2006, letter from ATA to G*Town discussing ATA's business partnership with G*Town. (Def.'s Opp. Ex. 5.)

3. Two drafts of an unexecuted contract between G*Town and Jackson on ATA letterhead for Jackson's performance on July 15, 2006, dated June 6, 2006 (Def.'s Opp. Ex. 4) and July 6, 2006 (Pl.'s Mem. Ex. 1B).

The negotiations between G*Town and ATA apparently broke down, and Jackson failed to perform on July 15, 2006. Iris argues that Jackson breached the G*Town Contract by failing to perform. (Def.'s Opp. 5.) G*Town argues that Iris breached the G*Town Contract by failing to provide agreed-upon travel arrangements. (Def.'s Opp. Ex. 4.) Jackson argues that he was never a party to the G*Town Contract. (Pl.'s Mem. 2.) However, as discussed further below, it is unnecessary for the Court to entangle itself in this factual dispute because the only issue presently before the Court is whether Jackson is subject to the G*Town Contract's arbitration provision.

At the second stage, Sedlmayr & Associates, PC ("Sedlmayr"), counsel for Jackson, negotiated for Jackson's performance directly with Arent Fox, PLLC ("Arent Fox"), counsel for Iris. In fact, ATA and Sedlmayr allegedly took over negotiations with Iris prior to the original July 15, 2006,

performance date. (Ferretti Aff. ¶ 10.) When negotiations broke down regarding the July 15, 2006, performance date, Sedlmayr and Arent Fox began negotiations for an alternative performance date of August 12, 2006. *Id.* These negotiations are similarly memorialized in several documents submitted by the parties, including:

1. An email thread dated July 6–10, 2006, between Iris, ATA, and Violator regarding concert details. (Def.'s Opp. Ex. 1D.)

2. A July 18, 2006, letter from Violator to Iris suggesting possibility of "do over of the Gabon date." (Def.'s Opp. Ex. 7.)

3. Two drafts of an unexecuted contract between Iris and Jackson on ATA letterhead for Jackson's performance on August 12, 2006, dated July 24, 2006 ("Draft Contract"). (Pl.'s Mem. Ex. 1C, 1D.)

4. An August 3, 2006, letter from ATA to Arent Fox and cc-ed to Violator and Sedlmayr confirming that the original July 15, 2006, concert date was contracted with G*Town. (Def.'s Opp. Ex. 6.)

5. An email thread dated August 2–3, 2006, between Sedlmayr and Arent Fox indicating failure of Jackson and Iris to reach an agreement. (Pl.'s Mem. Ex. 1E.)

The Draft Contract between Iris and Jackson does not contain an arbitration provision. Rather, it requires all disputes to be litigated in state or federal courts in New York City. (Pl.'s Mem. Ex. 1C, 1D ¶ 19.) The Draft Contract also provides for liquidated damages in the event of default:

3. *COMPENSATION*

PURCHASER [Iris] agrees to pay FURNISHER [Jackson] Three Hundred Thousand and 00/100 U.S. Dollars

($300,000.00) for the show (the "Compensation") free of all foreign taxes (such as box office, admission, license, franchise, property or other similar taxes) and without deductions of any kind, provided, however, that *FURNISHER acknowledges that purchaser has previously paid and shall receive a credit of $150,000 against the Compensation, leaving a sum of One Hundred Fifty Thousand and 00/100 U.S. Dollars ($150,000.00) to be paid.*

Deposits are to be paid to ATA o/b/o FURNISHER as follows (it being agreed by FURNISHER that all payments be made to FURNISHER hereunder shall be made to ATA and that payments made to ATA shall be deemed payments made to FURNISHER for all purposes of this Agreement).

16. *REMEDIES*

In the event that PURCHASER fails to fulfill in any material respect of any of PURCHASER'S obligations hereunder, on or before the dates and terms specified above or otherwise defaults in performing its obligations under this Agreement, in such event FURNISHER shall be entitled to collect/retain the Compensation as liquidated damages, whereupon this Agreement shall be terminated.

(Pl.'s Mem. Ex. 1D ¶¶ 3, 16.) (emphasis added). Similarly, a July 18, 2006, email from Violator to Arent Fox stated:

Fee as agreed upon and as follows: 50% of fee already paid shall serve as nonrefundable forfeited deposit. The remaining 50% of initial payment to serve as front end for new date with $150K balance on [Jackson] and $75K balance on [Elliot] due and payable immediately.

(Def.'s Opp. Ex. 7.) From these two documents, it is clear that the Draft Contract contemplated putting a portion of the $450,000 that Iris already paid to ATA pursuant to the G*Town Contract toward the alternative August 12, 2006, concert date. However, the parties do not allege that this Draft Contract, or any other contract besides the G*Town Contract, was ever actually executed by the parties. Nevertheless, Jackson argues, without citing any authority, that the above provisions of the Draft Contract entitled him to retain the $150,000 paid by Iris as a "kill fee" to compensate him for his preparation once the deal fell through. (Pl.'s Mem. 6–7.)

On May 15, 2007, once the deal fell through, Iris filed a Demand for Arbitration with the AAA against Jackson, G*Town, and Elliot pursuant to the arbitration provision in the G*Town Contract. On August 30, 2007, Jackson filed a Complaint to Stay Arbitration and for Declaratory Judgment in the Circuit Court of Arlington County, Virginia. On September 24, 2007, Iris removed the Complaint to this Court. On October 10, 2007, Iris filed an Answer to Jackson's Complaint. On October 11, 2007, Jackson filed a Motion for Preliminary Injunction to Stay Arbitration. On October 25, 2007, Iris filed a Response in Opposition to Plaintiff's Motion to Stay Arbitration. On October 31, 2007, Jackson filed a Reply in Support of his Motion to Stay Arbitration. On November 9, 2007, this Court issued an Order directing the Plaintiff to account for the $550,000 Iris paid to G*Town. On November 30, 2007, Jackson filed a Response to the Court's Order. On December 5, 2007, this Court issued an Order notifying the Plaintiff of its intent to consider entering summary judgment *sua sponte* and directing the Plaintiff to submit any additional evidence within eleven (11) days. On December 17, 2007, Jackson filed a Response to the Court's Order. Arbitration is scheduled for January 21–23, 2008. (Def.'s Opp. Ex. 10.)

## II. LEGAL STANDARD

### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "The purpose of the summary process is to avoid a clearly unnecessary trial," *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed.Cir.1991) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), and "it is not designed to substitute lawyers' advocacy for evidence, or affidavits for examination before the fact-finder, when there is a genuine issue for trial." *Continental Can Co. USA, Inc.*, 948 F.2d at 1265.

In ruling on a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party. *United States v. Lee*, 943 F.2d 366, 368 (4th Cir.1991). The moving party has the threshold burden of informing the court of the basis of the motion, of establishing that there is no genuine issue of material fact, and of showing that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also *Castillo v. Emergency Med. Assoc.*, 372 F.3d 643, 646 (4th Cir.2004).

Once the moving party satisfies this threshold showing under Rule 56(c), the burden of production, not persuasion, shifts to the non-moving party. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548. The non-movant must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (citation omitted in original). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. Thus, to defeat summary judgment, the non-movant must go beyond the pleadings with affidavits, depositions, interrogatories, or other evidence to show that a genuine issue of material fact exists. *Id.* at 324, 106 S.Ct. 2548.

Although district courts generally consider entry of summary judgment upon the motion of a party to the proceeding, "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Id.* at 326, 106 S.Ct. 2548; see also *U.S. Dev. Corp. v. Peoples Fed. Sav. & Loan Ass'n*, 873 F.2d 731, 735–36 (4th Cir.1989). Such notice must provide the full ten days called for by Fed.R.Civ.P. 56(c) and must be "sufficient to provide the losing party with an adequate opportunity to demonstrate a genuine issue of material fact." *U.S. Dev. Corp.*, 873 F.2d at 735.

### B. Arbitration

The Federal Arbitration Act ("FAA") applies to arbitration agreements "involving commerce." 9 U.S.C. § 2. Commerce is defined as "commerce among the several States or with foreign nations." *Id.* § 1. The disputed arbitration agreement in this case involves Jackson, a resident and citizen of Connecticut, and Iris, an unincorporated association whose members are residents and citizens of Florida

and Gabon, Africa. Therefore the FAA applies to this proceeding. The primary substantive provision of the FAA states, in relevant part, that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* § 2. Based on this provision, the United States Supreme Court has held that the FAA is a "congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). "The [FAA] establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* at 24–25, 103 S.Ct. 927.

■ However, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Technologies, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Therefore, there is an exception to the public policy favoring arbitration agreements where, as in this case, the issue is whether an arbitration agreement actually exists. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002); *see also Dockser v. Schwartzberg*, 433 F.3d 421, 426 (4th Cir.2006). In other words, while courts should presume arbitrability where ambiguity exists as to whether an issue "is within the scope of a valid arbitration agreement," courts must reverse the presumption where ambiguity exists as to whether the parties actually entered into such an arbitration agreement. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–45, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (quotation omitted).

These contrasting presumptions are based on public policy. *Id.*

■ Furthermore, a court deciding whether the parties agreed to arbitrate a particular dispute should generally apply "ordinary state-law principles that govern the formation of contracts." *Id.* at 944, 115 S.Ct. 1920; *see also Johnson v. Circuit City Stores*, 148 F.3d 373, 377 (4th Cir. 1998). However, the United States Court of Appeals for the Fourth Circuit has held that courts should apply the federal substantive law of arbitrability incorporated into the FAA when determining whether a non-signatory is bound to an arbitration agreement by the doctrine of equitable estoppel. *See R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 160 n. 1 (4th Cir.2004); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 (4th Cir.2000).

The Court notes that the public policy generally favoring arbitration is based, in part, on the fact that the time and costs associated with arbitration are significantly less than that of litigation. Ironically, federal courts are now hamstrung by the very rules intended to benefit the litigants appearing before them. Litigation in federal courts is now subject to hundreds of rules which were designed to minimize the time and costs of litigation. However, these rules often have the unintended consequence of maximizing the time and costs of litigation. In many cases, the rules were drafted by professors, not trial lawyers, and, unfortunately, what is true in theory is not always true in practice. The advent of discovery, coincidentally coinciding with the advent of the billable hour, has led to a dramatic rise in trial costs because the incentives created by billable hours have led to unnecessarily protracted litigation. Therefore, in situations where a court *does* determine that the parties have agreed to arbitrate a particular dispute,

the public policy favoring arbitration remains in full force.

## III. ANALYSIS

 In his December 17, 2007, Submission in Response to this Court's December 5, 2007, Order, Jackson alleges that there are essentially two material factual disputes that preclude this Court's entry of summary judgment at this time: (1) whether G\*Town was an agent or apparent agent of Jackson, and (2) whether the G\*Town Contract or the Draft Contract controls the dispute between the parties for purposes of this proceeding. However, for the reasons set forth below, the Court hereby **FINDS** that there is no genuine issue of material fact with respect to which contract controls the narrow dispute between the parties over whether Iris' claims against Jackson are subject to arbitration.

 Furthermore, Jackson is correct in noting that the central factual dispute between the parties appears to be G\*Town's agency status. Therefore, as a threshold matter, viewing the facts in the light most favorable to Jackson, the Court will assume, without deciding, that G\*Town is neither Jackson's agent nor Jackson's apparent agent for purposes of this opinion. However, whether G\*Town is Jackson's agent is immaterial, and Iris is nevertheless entitled to summary judgment as a matter of law pursuant to Fed. R.Civ.P. 56(c). Under the doctrine of equitable estoppel as applied by the Fourth Circuit, a party (or his agent) need not actually sign a contract in order to be bound by the contract's arbitration clause so long as the party retains a "direct benefit" of the contract. *Schwabedissen*, 206 F.3d at 418 (internal quotations and citations omitted). As the Defendant correctly notes, "[t]he obligation and entitlement to arbitrate does not attach only to one who has personally signed the written ar-

bitration provision. Rather, well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Washington Square Sec., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004) (internal quotations and citations omitted).

 It is an axiomatic rule of contract law that a party may not "rely on the contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 839 (7th Cir.1981) (internal quotations and citations omitted). Generally, the doctrine of "[e]quitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity." *Schwabedissen*, 206 F.3d at 417–18 (internal quotations and citations omitted). Under the federal substantive law of arbitrability incorporated into the FAA, the Fourth Circuit has explicitly applied the common-law doctrine of equitable estoppel to the arbitration context:

> In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. *To allow a [party] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purpose underlying the enactment of the [FAA].*

*Id.* at 418 (internal quotations and citations omitted) (emphasis added). In the specific situation where, as in this case, a signatory

seeks to enforce an arbitration agreement against a non-signatory, the doctrine estops the non-signatory from claiming that he is not bound to the arbitration agreement when he receives a "direct benefit" from a contract containing an arbitration clause. *Id.* (internal quotations and citations omitted); *see also Am. Bankers Ins. Group, v. Long,* 453 F.3d 623, 628 (4th Cir.2006); *R.J. Griffin,* 384 F.3d at 162; *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir. 1999) (holding that non-signatory was estopped from denying applicability of arbitration clause where nonsignatory received "direct benefits" from contract including lowered insurance rates and the ability to sail under the French flag).

For example, in *Schwabedissen,* International Paper bought an industrial saw from Wood Systems, a distributor. 206 F.3d at 414. The saw was manufactured by Schwabedissen pursuant to a contract between Wood Systems and Schwabedissen containing an arbitration clause. *Id.* International Paper was not a signatory to the contract. *Id.* The industrial saw was defective, and International Paper sued Schwabedissen for breach of the terms and warranties of the contract. *Id.* The Fourth Circuit found that International Paper was equitably estopped from denying the applicability of the arbitration clause to its claims against Schwabedissen because International Paper could not both accept the contract's benefits (the warranty provisions) and, at the same time, reject the contract's burdens (the arbitration provisions). *Id.* at 416–19.

In this case, just like International Paper in *Schwabedissen,* Jackson seeks to have his cake and eat it too. Iris paid G*Town $550,000 pursuant to the G*Town Contract.[1] (Walker Aff. ¶ 9.) No other sums were paid by Iris. G*Town then paid $450,000 to ATA, Jackson's undisputed agent. (Pl.'s Nov. 30 Sub. Ex. 1.) ATA then paid $150,000 to Jackson and $75,000 to Elliot. *Id.* Jackson concedes that he retained the $150,000 payment. (Lighty Aff. ¶ 10.) The $150,000 ultimately retained by Jackson was a "direct benefit" of the G*Town Contract executed by Iris and G*town. Pursuant to the test outlined by the Fourth Circuit, Jackson is therefore equitably estopped from denying the applicability of the arbitration clause, even though, allegedly, neither he nor his agents signed the G*Town Contract. *Schwabedissen,* 206 F.3d at 418. Iris' $150,000 payment to Jackson, albeit indirect, was intended to be partial consideration for his performance in Africa pursuant to the G*Town Contract. It would be inequitable to permit Jackson to retain the direct benefits of the G*Town Contract (the $150,000 paid by Iris) while, at the same time, permitting him to deny the contract's burdens (the arbitration provision). *Id.* at 419.

Furthermore, Jackson did not retain the $150,000 as a mere "third-party beneficiary" of the G*Town Contract. Rather, the only possible justification for Jackson's retention of the $150,000 is that he is entitled to damages for Iris' alleged breach of the G*Town Contract pursuant to the contract's liquidated damages provision. (Def. Opp. Ex. 1B ¶ a.) Jackson's claim to the $150,000 is therefore certainly a "direct," rather than indirect, benefit of the G*Town Contract. Just like International Paper in *Schwabedissen,* Jackson cannot

---

1. Jackson claims he "has no personal knowledge as to the source of any funds G*Town received" (Pl.'s Nov. 30 Sub. ¶ 2.) However, the draft contracts submitted by Jackson clearly state that "PURCHASER has previously paid" Jackson $150,000 and that the purchaser is "Iris International." (Pl.'s Mem. Ex. 1C, 1D ¶ 3.) Thus the source of the $550,000 paid to G*Town is obvious based on Jackson's own submissions.

simply choose to enforce favorable provisions of the G*Town Contract (the liquidated damages provision) and, at the same time, avoid the unfavorable provisions (the arbitration provision). Although Jackson may, in fact, be entitled to retain the $150,000 as a "kill fee" or otherwise pursuant to the liquidated damages provision of the G*Town Contract, the merits of his claim to the $150,000 are of no consequence to this proceeding and shall be decided by an arbitrator. All that matters for purposes of the proceeding before this Court is that Jackson implicitly asserts a claim to $150,000 based on a provision of the G*Town Contract that "directly benefits" him, and that he is therefore subject to the contract's arbitration provision as well.

 Jackson nevertheless argues that, once the deal fell through, he was entitled to retain the $150,000 Iris paid him as a "kill fee" pursuant *not* to the G*Town Contract but, rather, pursuant to a *subsequent* contract between Iris and Jackson ("Draft Contract") that did *not* contain an arbitration provision. (Pl.'s Mem. 6–7.) Indeed, Jackson correctly identifies the only factual dispute between the parties relevant to this Court's equitable estoppel inquiry: whether Iris paid the $150,000 pursuant to the G*Town Contract or the Draft Contract. (Pl.'s Dec. 17 Sub. ¶ 3(d).) Unfortunately for Jackson, *the Draft Contract was never executed by the parties,* and therefore cannot serve as the basis for Jackson's claim to the $150,000.[2] In essence, Jackson argues that he may retain the funds paid by Iris pursuant to terms of a contract that were never agreed upon. Despite the many opportunities the Court has given Jackson to provide support for

this argument, he cites no precedent for such an extraordinary proposition, and this Court is aware of none. In addition, even if the Draft Contract was executed, pursuant to its terms, Jackson would be entitled to liquidated damages (his supposed "kill fee") only if Iris "defaults in performing its obligations under [the Draft Contract]." (Pl.'s Mem. Ex. 1D ¶¶ 3, 16.) This Court is unable to fathom how Iris can breach the terms of a contract that was never executed.

Furthermore, the facts and circumstances surrounding the payment of $150,000 to Jackson clearly indicate that the funds were intended as payment pursuant to the G*Town Contract and not pursuant to the Draft Contract. First, it is undisputed that the funds ultimately received by Jackson and ATA, Jackson's agent, passed through G*Town. However, because Jackson vehemently denies that G*Town was involved in any way with subsequent negotiations over the Draft Contract (Ferretti Aff. ¶ 9), the funds must have been originally paid pursuant to the G*Town Contract. Second, the timing of the various transactions establishes that the money changed hands pursuant to the original G*Town Contract. G*Town and Iris entered into the G*Town Contract on February 22, 2006. (Pl.'s Comp. Ex. A1, A2.) G*Town paid ATA on May 24, 2006, and June 8, 2006. (Pl.'s Nov. 30 Sub. Ex. 1.) ATA paid Jackson $150,000 on June 28, 2006. (Pl.'s Nov. 30 Sub. Ex. 1.) The original concert date was July 15, 2006. It was not until July 18, 2006, that Violator even suggested the "do over of the Gabon date" that was contemplated in the Draft Contracts. (Def.'s Opp. Ex. 7.) In fact, the Draft Contracts specifying an August 12,

---

**2.** Jackson concedes that the Draft Contract was not executed. (Pl.'s Dec. 17 Sub. ¶ 13.) Therefore, viewing the facts in the light most favorable to Jackson, there is no genuine is-

sue as to any material fact and Iris is entitled to judgment as a matter of law pursuant to Fed. R. Civ. 56(c).

2006, concert date were dated July 24, 2006—a full month after Jackson was paid. (Pl.'s Mem. Ex. 1C, 1D.) This Court cannot fathom how Iris could have paid Jackson an "advance" on June 28, 2006, pursuant to the Draft Contract, when the circumstances necessitating that Draft Contract (Jackson's failure to perform in Africa) did not arise until July 15, 2006.

Nevertheless, various documents indicate that the parties did *contemplate* entering into an agreement by which the money Iris already paid pursuant to the G*Town Contract would be put toward the alternative August 12, 2006, concert date. For example, the Draft Contract states: "[Jackson] acknowledges that [Iris] has previously paid and shall receive a credit of $150,000 against the Compensation, leaving a sum of One Hundred Fifty Thousand and 00/100 U.S. Dollars ($150,000.00) to be paid." (Pl.'s Mem. Ex. 1D ¶ 3.) Similarly, a July 18, 2006, email from Violator to Arent Fox states: "50% of fee already paid shall serve as non-refunded forfeited deposit. The remaining 50% of initial payment to serve as front end for new date." (Def.'s Opp. Ex. 7.) However, this agreement was *never consummated*. Iris and Jackson never agreed to alter the original purpose of the $150,000 Iris initially paid because they never agreed on the terms of the subsequent Draft Contract. Therefore, this Court hereby **FINDS** that the $150,000 was paid pursuant to the original G*Town Contract, the only contract that actually was executed between the parties at the time Iris paid, and Jackson received, the funds.

Jackson cites several cases from other Circuits in support of his argument that this Court should issue a preliminary injunction to stay the arbitration pending against him with the AAA, but none of them support his argument that he is entitled to both retain the $150,000 paid by Iris and ignore the G*Town Contract's arbitration clause. For example, in *Flink v. Carlson,* a customer sued a securities brokerage house and the brokerage house's registered representative. 856 F.2d 44 (8th Cir.1988). Two separate contracts between the customer and the brokerage house and between the brokerage house and the registered representative each contained arbitration clauses specifying different arbitrators. *Id.* at 45. The United States Court of Appeals for the Eighth Circuit stayed the arbitration, which was proceeding pursuant to the contract between the customer and the brokerage house, of the brokerage house's third-party claims against the registered representative because that contract only required arbitration of the brokerage house's disputes with the *customer;* disputes with the *registered representative* were governed by a separate contract's arbitration clause. *Id.* at 47. Even if this precedent was binding in the Fourth Circuit, the case is inapposite because there is only one contract in this case and it requires arbitration of "[a]ny claim or dispute arising out of or relating to the Agreement." (Def. Opp. Ex. 1B ¶ 13.)

Other cases cited by Jackson are even less relevant. For example, in *Paine-Webber Inc. v. Hartmann,* the United States Court of Appeals for the Third Circuit stayed a customer's arbitration against a brokerage house where the statute of limitations in the applicable arbitration rules barred arbitration of the customer's claims. 921 F.2d 507, 514 (3d Cir. 1990). Similarly, in *Brooks & Co. Gen. Contractors v. Randy Robinson Contracting, Inc.,* the Virginia Supreme Court stayed a general contractor's arbitration against a sub-contractor where the contract containing the arbitration agreement was never executed by the parties. 257 Va. 240, 513 S.E.2d 858 (1999). These cases are inapplicable, however, because

they do not address the precise situation at issue in this case in which a non-signatory retains the direct benefits of an otherwise valid arbitration agreement. In such situations, the Fourth Circuit has determined that claims against the non-signatory are subject to arbitration. *Schwabedissen,* 206 F.3d 411.

Finally, Jackson argues that he will be "greatly prejudiced" if this Court grants summary judgment at this time because the arbitrators may view this Court's opinion as a dispositive ruling that Jackson is bound to all of the terms of the G*Town Contract. (Pl.'s Dec. 17 Sub. ¶ 6.) However, the parties and arbitrators should take note that the scope of this Court's opinion is limited to the only issue raised in Jackson's Complaint: whether Iris' claims against Jackson are subject to arbitration. Therefore, any other disputes between the parties regarding "which contract governs" remain unresolved. *Id.*

### CONCLUSION

Viewing the facts in the light most favorable to the Plaintiff, the Court hereby **FINDS** that the Defendant has established that there is no genuine issue as to any material fact and that the Defendant is therefore entitled to judgment as a matter of law pursuant to Fed.R.Civ.P. 56(c). Furthermore, the Court hereby **FINDS** that the Plaintiff has failed to show that there is a genuine issue as to any material fact that would preclude this Court's entry of summary judgment for the Defendant holding that Iris' claims against Jackson are subject to arbitration.

Therefore, for the foregoing reasons, the Court hereby **DECLARES** that the claims against the Plaintiff are subject to arbitration, **GRANTS** summary judgment *sua sponte* for the Defendant, and **DISMISSES** the case without prejudice to any claims presented in arbitration.

The Clerk of the Court is **DIRECTED** to deliver a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**